# Daniel Gordon *vs.* Martha A. Miller and J. M. Miller, Adm'rs of Augustus Miller.

An attorney claimed out of funds in equity, the amount awarded to a cer-tain judgment, 1st, because the judgment had been entered for his use, and 2nd, because reasonable compensation for his services would amount to the sum claimed. The court, by its order, allowed him an amount *less* than that awarded by the auditor to this judgment, and the *other parties* appealed. HELD:

That this order, by allowing such less sum, virtually struck out the entry of the judgment to the attorney's use, and not having appealed, he can-not, upon the appeal of the other parties, insist that the court below, as a court of equity, had no authority to strike out the use.

Three judgments were placed in the care of an attorney, who also obtain-ed another, by confession, against the same defendant, in favor of the same plaintiff, his client. On these judgments he ordered executions to lie from term to term, and *died* before making any thing from them. They then came to the hands of another attorney, and, by a sale of the property levied on, part of the money was made. A bill in equity was then filed to sell the residue of the defendant's real estate for their pay-ment, and the amount realized was still insufficient for the payment of the judgments in full. HELD,

That the most which should be allowed the representatives of the deceased attorney, for his services, was, *one-half* of five *per cent.* on the net amount of the proceeds of sale, both under the executions and decree.

APPEAL from the Equity side of the Circuit Court for Cecil County.

This appeal was taken from an order of the court below, (CONSTABLE, J.,) passed in 1854. The facts of the case are fully stated in the opinion of this court.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*John C. Groome,* for the appellant.

The whole sum realized under the several judgments in charge of Miller, in his lifetime, amounted to $755 only, from which, of course, were to be deducted the costs and sheriff's fees, and even this sum was not realized until after the death of Miller and when the cases had passed into the hands of another attorney. The invariable charge made by attorneys in Maryland, where there has been no contest, is a commission of five per cent. on the amount recovered, which, if allowed on the gross amount of sales under the executions in these cases, would be $37.75, whereas the court has allowed, with the addition of eleven years interest, $498, or two-thirds of the whole gross sum—a rate of compensation entirely disproportioned to the services rendered, or the benefit conferred, or the labor bestowed. Miller can reasonably claim no compensation on the real estate sold subsequently under a decree in chancery, which brought $1400, for it was because that part of F. Gordon's real estate had never been levied upon, in his lifetime, by any execution on the judgments in Miller's hands, that it became subject to be sold under the decree after his death, and it would be clearly wrong to allow an attorney compensation for not doing what he ought to have done, whereby a new proceeding, attended with new expense, became necessary. It is not contended that an attorney cannot recover for professional services, but only that his compensation shall be proper, and bear some reasonable proportion to the benefit which his services shall confer upon his client. But a fee of $498 for doing nothing but renewing writs of execution from term to term, whereby the recovery of the mo-

ney was delayed, and whereby, too, in consequence of his failure to include in his levy the whole real estate of the defendant, it subsequently became necessary to resort to a bill in chancery, to realize the full benefit of the judgments, at an increased expense, would seem to be very unreasonable. And if such a fee be proper for one attorney, who merely ordered the executions to lie unexecuted, surely a fee of equal, if not greater magnitude, should be paid to the attorney who enforced the executions and made the money, and then the fees would exceed the actual sums recovered under the executions.

But assuming, for the sake of the argument, that Miller was entitled to charge on the whole amount of sales, both under the executions and the decree—the whole amount being $2155 —still an allowance of $300, with eleven years interest, would be most exorbitant, for surely the attorney who succeeded him, and under whose management this sum was realized, would be entitled to at least the same amount of compensation, and the aggregated fees would nearly equal fifty per cent. of the gross receipts.

But again, this is a claim set up for compensation which is denied by the appellant. The appellees are therefore bound to prove the services and their value. How have they done it? They have shown that their intestate took charge of three judgments, in 1836, which had been previously obtained by another attorney, for an aggregate sum of upwards of $1000, and that he obtained a fourth judgment for $9780, and on these he issued and renewed, to lie in the clerk's office, writs of *fi. fa.*, from term to term, for a few years, without realizing or attempting to realize any part of them, and when, after his death, they were enforced by another attorney, the property taken under them brought only $755. These are the services for which compensation has been asked and the enormous sum of $498 allowed. What is the proof of their value?— the affidavit of two highly respectable lawyers and gentlemen, that, in their opinion, the sum of $300 was a moderate compensation. Now these gentlemen must surely have supposed that the large amount of these judgments, which seems to have been the reason why they fixed upon so large a compen-

sation, had been recovered, or was, at least, *recoverable*, for it is impossible they could have meant that the taking charge of judgments, for *nominally* large amounts, on which but little or nothing could ever be recovered, would entitle the attorney to such a fee, particularly where he had done nothing towards enforcing the judgments, but write a letter twice a year to renew the executions. Indeed, it is almost impossible to suppose they knew that only $755 in all, had been made by the executions, or that they would have allowed so liberally, even if they had regarded the chancery proceeds as proper to be taken into the account, had they known that these proceeds would only swell the sum to $2155. Still less is it to be supposed they expected their estimate to be increased by the addition of eleven years interest, when the fund, for the recovery of which the compensation was to be paid, had not, even at the time of their affidavit, been received by the appellant. It would seem then, that under every view of the case, looking to the facts alone, this rate of compensation allowed by the court below, cannot be sustained.

But Miller bases his claim to the money, awarded out of the sales of the real estate, to the judgment marked to his use, upon two grounds: 1st. That the judgment is marked to his use, and this is the only real ground on which he can, in this case, regularly set up any claim whatever. If the judgment had been *properly* marked for his use, it would be clear and indisputable the proceeds would be his. But 'it is conceded that the order to mark it for his use was his own act and written by himself, and there is no proof that he was ever authorized by D. Gordon to make such an order; on the contrary, if Gordon had so directed, he would have done so in writing, and that writing would have been filed as the authority.

Besides, Gordon, in his answer, denies most positively that he ever made such an assignment, or that Miller ever had his consent or authority to make it. This portion of the answer being responsible to the petition and uncontradicted, is conclusive as to this point, (4 *G. & J.*, 479, *Brown vs. Wallace*,) and therefore, on this ground, the appellees cannot recover. 2nd. But he claims the money on the ground, also, that rea-

sonable compensation for his services, with interest from 1836, would amount to this sum. It has already been shown, reasoning from the facts, that the compensation allowed is exorbitant and unreasonable for the services rendered, and that it is unprecedented to allow interest for services to commence before the fruits of those services were enjoyed. But how can the administrators of Miller expect to be allowed a claim for compensation against D. Gordon, out of the proceeds of the sale of F. Gordon's real estate, sold under a decree in a creditor's suit? His is not a claim against F. Gordon, the deceased person whose estate has been sold, and is to be distributed by the trustee, but it is a claim against F. Gordon's *creditor*, to whom the proceeds have been allowed. What right then has a court of equity to entertain jurisdiction of a demand, which, if it exist at all, is a demand for which the claimant has ample remedy at law? and where does it derive the power to settle a controversy between a party to a suit depending before it and a stranger, in regard to a subject matter not involved in the cause? In a word, what right had the Circuit Court for Cecil county, as a court of equity, to appropriate to Miller any part of the proceeds of F. Gordon's estate, in payment of a controverted claim for services alleged to have been rendered to D. Gordon, one of the creditors of F. Gordon? If this claim for services existed, Miller's administrators had their remedy at law, and as D. Gordon resided in Pennsylvania, they could have proceeded by attachment, and where there is a full and complete remedy at law, and no ground shown for going into a court of equity, that court will not interfere. 1 *H. & G.*, 229, *Drury vs. Conner.* Upon neither of the grounds, therefore, taken by the appellees, are they entitled to recover any thing.

*Otho Scott* for the appellees.

Miller, in his lifetime, was counsel in three judgments entered for the use of the appellant, and recovered a judgment, for the appellant, for $9780, at October term 1835. Daniel Gordon lived out of the State, and, according to the practice of the clerk, Miller, as counsel, was responsible for costs.

Miller kept the *fi. fas.* on the judgment renewed, so as to preserve the lien of the appellant, and would, no doubt, have had the judgments executed but for the fact that Francis Gordon, the defendant in all of them, was the brother of the appellant, and he did not want his brother pressed.   Miller entered, as counsel for the appellant, one of the judgments for his use, and as this entry was standing on the record for nearly twenty years, the appellant must have had notice of it, but did not move to have the use to Miller stricken out.   The appellees insist:

1st. That Miller had, according to the proof of Bond and Archer, a just claim against the appellant for $300.

2nd. That the entry of the judgment, for the use of Miller, after such a lapse of time, without objection, is presumed to be made with the appellant's consent.

3rd. That the entry of the use should have been controverted in Cecil county court.   It was an entry on the records of that court, and that court had full power to correct it on motion, and no motion to correct it was ever made.

4th. That an attorney has a lien on a judgment for his services, and may protect that lien by entering the judgment for his use.

In this case it is clear, from the proof and circumstances, that the appellant owed Miller, in his lifetime, for services. Miller had a lien for these services.   *Montague on Liens,* 32, 59.   The presumption is strong that Gordon assented to the entry of the judgment to Miller's use, from the fact that he never disputed the entry for nearly twenty years after it was made, and it was of record all that time; he never disputed it till nine years after Miller's death, and then only disputed it in the court of Chancery, when, we contend, it could only be disputed in the court where it was made, that court having jurisdiction of its own records, and the power to settle the matter, on motion, on equitable principles.   It has been the practice in this State for counsel to enter judgments for their use to secure fees, and the lien which the law gives them would be nugatory without such an entry, particularly when the client, as in this case, lives out of the State.   Without

such right to enter to his use, the counsel would be responsible for. costs, and the client might settle with the defendant, and leave counsel to pay the costs and lose his fees. On motion to strike out the use, the court would not do so till the attorney was paid his just demands, and a court of equity, when the question comes up there, would not set aside the use till the claim of the attorney was paid.

Tuck, J., delivered the opinion of this court.

This appeal is from an order passed on the equity side of the Circuit court for Cecil county.

It appears that three judgments were rendered in Cecil county court against Francis Gordon, which in the year 1836 were paid by Daniel Gordon, (the appellant,) and were marked for his use, when they were confided to the professional care of Augustus Miller, (the appellees' intestate,) who, as attorney for the appellant, during the same year, obtained the confession of another judgment by the said Francis Gordon, for the sum of $9780. Mr. Miller renewed writs of *venditioni exponas* upon the first three judgments, and issued a writ of *fieri facias* on the last judgment, and renewed the said writs from term to term, to lie in office, up to the time of his decease, in January 1842, but no sale was made under any one of them during that time.

At his death, the cases were placed in the hands of another attorney.

A sale was then made and the gross sum of $755 only, was produced from the sale of the property of F. Gordon, on which levy had been made. Francis Gordon having died leaving other real estate, not included in the aforesaid sale, Daniel Gordon filed a creditor's bill in chancery, against the heirs of Francis Gordon, obtained a decree for the sale of such other real estate, and under the decree the same was sold for $1400.

The four judgments were the claims on which the decree was passed.

The sale being ratified, the auditor made a report in January 1853, in which, after deducting. costs, expenses and commissions, there remained a balance of $1284.44, and this sum

Gordon *vs.* Miller's Adm'rs.

he allowed in favor of Daniel Gordon, the appellant, on account of the three oldest judgments.

On the 11th of May 1853, the appellees filled a petition, alleging that Daniel Gordon was indebted to their intestate, during his life, in the sum of five hundred dollars, for fees paid for him and for professional services as an attorney at law; that said Gordon being so indebted, and not being a resident of this State, assigned to him (the said Augustus Miller) that one of said judgments which was obtained at October term 1835, by Robert Oliver's executors against Francis Gordon, for the sum of $412.56, with interest from the 3rd of June 1834.

The petition refers to the sale made under the decree in equity, and alleges that Daniel Gordon is claiming the said judgment, although it belongs to the petitioners by virtue of the said assignment: it also states that the said Daniel had exhibited a copy of the judgment, omitting in the copy the entry of the use to Augustus Miller, and on this copy so omitting the use, a report of the auditor has been procured, in which the sum due on said judgment is awarded to said Daniel, when it should have been awarded to the petitioners. They therefore pray, that the report of the auditor, so far as relates to the said judgment, may not be confirmed, and that the amount thereof may be ordered to be paid, out of the proceeds of the sale to them. With the petition is filed, as an exhibit, a copy of the said judgment, having upon it the use of Augustus Miller.

In Daniel Gordon's answer to this petition he denies all indebtedness to A. Miller, except as to some costs incurred on the last judgment against Francis, or that he ever obtained any substantial benefits from his (Miller's) professional services; and he also denies that he ever acknowledged himself indebted to Miller for professional services, or ever made him any assignment of either of said judgements; but Gordon declares that the assignment was made by Miller himself without his knowledge, consent or authority, and that he (Gordon) was not aware of said assignment having been made until he came to enforce his claims in chancery.

W. B. Bond and H. W. Archer, attorneys at law, in their deposition say, "That for the following professional services, to wit, taking charge of three judgments amounting in the aggregate to more than one thousand dollars, and obtaining another judgment for nine thousand, seven hundred and eighty dollars, the sum of three hundred dollars would be very reasonable compensation."

This deposition it was agreed should be received in evidence as if made under a commission.

It is admitted that the judgment of Oliver's Executors against Francis Gordon and others for the use of Daniel Gordon, use of Augustus Miller, was marked for the use of said Miller by an order written by himself.

It is also admitted that Miller had charge of the four judgments, as counsel on the record for Daniel Gordon, from October 1830, till his death in January 1842. That he issued *fi. fas.* on said judgments to lie."

The appellees claimed, in the court below, the whole amount awarded out of the proceeds of sale, in the cause, to the judgment which had been marked for the use of Augustus Miller. They claimed the same:

1st. Because the judgment had been marked for Miller's use.

2nd. Because a reasonable compensation for his services, with interest thereon from 1836, would amount to the sum claimed.

The appellant's objections, as urged below, were, because Miller marked the judgment for his own use without authority, and because he never did more than renew the *fi. fas.* from term to term, and the compensation bears too large a proportion to the whole amount ultimately recovered on all the judgments.

In October 1854, the court passed an order which contains the following language:

"Whereupon it is adjudged and ordered, that the petitioners, administrators of Augustus Miller, deceased, be allowed the sum of three hundred dollars, with eleven years interest thereon, and that the trustee pay the same out of the amount awarded to Daniel Gordon, in the within account of the auditor, and

that the said account and audit, in all other respects be, and the same is hereby finally ratified and confirmed."

From this order Daniel Gordon appealed.

It will be seen that the amount allowed by the court, in favor of the appellees, is less than the amount awarded by the auditor upon the judgment which had been marked for Miller's use, and from this order of the court the petitioners have not appealed.

Before the court could have allowed the appellees less than the auditor had awarded upon the judgment, out of the proceeds of sale, the court must, necessarily, have held that the use had been entered upon the judgment without authority.  If the use was properly entered, it transferred in equity, the whole judgment, and if Miller thereby became the owner of the whole claim, his representatives were entitled to the entire dividend allowed thereon by the auditor.  The court have virtually stricken out Miller's use; for it was certainly disregarded in the passage of the order, and the petitioners not having appealed from the same, they cannot now insist that the court below, as a court of equity, had no authority to strike out the use.

But whilst striking out the use for the purpose of doing equity to Gordon, we must presume the judge considered it but proper to require that equity should be done to Miller's representatives, and for that purpose the allowance was made to them out of the fund in court, which was the subject in controversy.  But the appellant objects to this allowance, insisting that it is not reasonable under the circumstances.

The three elder judgments were obtained before Daniel Gordon had any interest in them.  They were assigned to him in 1836, and then he placed them under the control of Miller.  The fourth judgment was confessed in favor of D. Gordon, by his brother F. Gordon, without controversy.  Mr. Miller appearing as attorney for the plaintiff.  From October 1836 to to January 1842, when he died, he had charge of the four judgments; but no steps were taken by him for the collection of the money, further than to order executions to lie in office from term to term.  During that period no payments were made.

It may be, as suggested by the appellees' counsel, that Miller did not cause the judgments to be executed, because Daniel Gordon did not wish his brother to be pressed.

After the decease of Mr. Miller the judgments came into the hands of another attorney, and by a sale of the property levied upon under the three eldest, the gross sum of $755 only, was realized. The bill in equity was then filed, for the purpose of selling the residue of the real estate of Francis Gordon, which resulted in the sale reported in this case as amounting to $1400. The auditor's statement shows that after deducting commissions, costs and expenses, there remained the sum of $1284.44; which he awarded to the three eldest judgments.

In the case of *Notley Young's Estate*, 3 *Md. Ch., Dec.* 475, it appears that claims were placed in the hands of an attorney, which, subsequently, and before they were paid, came to the hands of another attorney. The facts show that some of the claims had been reduced to judgments, whilst upon others suits had been brought, which were still pending. The first attorney, J. B. Brooke Jr., was employed by the administratrix of Notley Young. After her decease the claims were taken from the control of Mr. Brooke, by the administrators *de bonis non.* The late Chancellor Johnson having decided that they had the right of placing these claims in whosesoever hands they pleased for collection, then says: "But in the exercise of this right justice should be done the attorney who had instituted suits and obtained judgments, and this, I think, will be accomplished by dividing the usual commission of five *per centum* equally between him and the attorney by whom the money may be collected, and an order will be passed accordingly."

If, for the benefit of Mr. Miller's estate, the principle of the chancellor's decision should be applied in the present case, we think it will be going quite as far as will be consistent with equity.

The gross sum of $755 was produced by the sale, under the executions. The record does not show how much, if any part, of this sum was applied to the payment of sheriff's fees and expenses of sale; the whole amount will therefore be added to the nett proceeds of the chancery sale, ($1284.44,)

making together the sum of $2039.44. The one half of five *per centum* on that amount is $50.99.

The order appealed from will be reversed, and instead of the amount allowed therein to the appellees they will be allowed the sum of $51, with a due proportion of interest thereon, which has been or may be received by the trustee since the sale made by him. The auditor's reports in all other respects will be ratified and confirmed.

The respective parties are to pay their own costs in this court.

For the purpose of having the principles announced in this opinion carried into effect, the cause will be remanded.

> *Order reversed and cause remanded*
> *without costs in this court.*

