## WALTER H. HARRISON, JR., *v.* DOROTHY ROBINETTE ET AL.

[Nos. 18, 19, April Term, 1934.]

*Decided June 11th, 1934.*

The causes were argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Wm. Purnell Hall,* with whom was *Elmer H. Miller* on the brief, for the appellant.

*B. Sydney Becker* and *John H. Skeen,* with whom were *Emory, Beeuwkes, Skeen & Oppenheimer* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

In November, 1931, the appellees in this case, being seised in fee of two lots of ground known as Nos. 400 and 402 Hanover Street in the City of Baltimore, executed a mortgage thereon to secure the repayment of a loan of $5,000 made by the Merchants' Mortgage Company, which, in November, 1932, assigned it to the New Calvert Company. In January, 1932, they executed a second mortgage on the same property to the Fourth District Corporation, to secure a loan of $2,000, which on November 25th, 1932, it assigned to Frederick D. Carozza, and on February 2nd, 1932, they executed a third mortgage thereon to secure a loan of $500 made by the Chesterfield Company. On November 10th, 1932, they executed to W. H. Harrison, Jr., what was the fourth mortgage on the property, to secure a supposed loan of $5,250, after having on July 26th, 1932, executed a deed conveying the lots to Theodore Messersmith who in turn conveyed them to one Reuben Queen; but neither of those deeds was ever recorded. On November 9th, 1932, the New Calvert Company instituted proceedings to foreclose its mortgage, a sale of the property for $10,300 was reported and ratified, and the case referred to the auditor. After paying the first, second and third mortgages in full, there remained $3,525.74, which the auditor in his report awarded to Harrison on account of his fourth mortgage. To that report Harrison excepted on the grounds (1) that there should have been no allowance on account of the third mortgage and (2) that "The Thomas Company"

had not reported certain rent collected; and the appellees excepted on the ground that the mortgage to Harrison was without consideration, and void.

The appellant's exceptions are not directly involved in this appeal, but the real question which it presents is raised by the appellees' exceptions and appellant's answer thereto.

In their exceptions appellees alleged, in substance, that prior to the mortgage to Harrison their property was leased to the Texas Company under a lease which gave that company an option of purchasing it for $30,000; that Harrison had undertaken to effect a sale of the property at that price, and that they had agreed, if he succeeded in that attempt, to pay him as a fee or commission $5,000; that to secure the payment of that fee they executed first a confessed judgment note for that amount, and later the mortgage of $5,250, to Harrison; that he never did effect a sale of the property for any amount, that the real consideration for the mortgage failed, and that it should be set aside. After denying all allegations of the Robinette exceptions, including those later established by record evidence, or conceded, Harrison in his answer, supported by his affidavit, said: "He was employed by Dorothy Robinette, John H. Robinette, Jr., Arthur Graham Robinette and Cornelia Janet Robinette, his wife, to represent them in certain proceedings in the Circuit Court No. 2 of Baltimore City entitled 'Dorothy Robinette, John H. Robinette, Jr., Arthur Graham Robinette and Cornelia Janet Robinette v. The Chesterfield Company, The Thomas Company and Morris Macht' and that he was given a confession of judgment note for the sum of Five Thousand Dollars, dated October 24, 1932, as his fee in the said cause and that on November 10, 1932, he was given a mortgage on 400 and 402 S. Hanover Street, Baltimore, by the said parties for Five Thousand Two Hundred and Fifty Dollars as additional security for the said note of October 24, 1932; that he performed all his duties as counsel for the said parties in the said cause and has justly earned the fee paid him. He further says that he

has expended for the benefit of the said parties large sums of money."

Following those pleadings there ensued a confusing and conflicting series of hearings and orders which finally culminated, on September 20th, 1933, in an order in which the court decreed that, "The petition of Dorothy Robinette, John H. Robinette, Jr., Graham Robinette and Cornelia Janet Robinette, his wife, be overruled, but that the report of the Auditor be modified and that the sum of Two Thousand Dollars be awarded to the said Walter H. Harrison, Jr., and that the balance of the net proceeds of the sale be awarded to Dorothy Robinette, John H. Robinette, Jr., and Graham Robinette, equally to be divided among them," which was followed by a show cause order of October 17th, 1933, identical with that except that it contained this additional provision: "That the said Walter H. Harrison, Jr., be and he is hereby restrained and enjoined from attaching or claiming any part of this fund payable to Dorothy Robinette, John H. Robinette, Jr., and Graham Robinette, unless cause to the contrary be shown on or before the 23rd day of October, 1933, provided a copy of this decree be served on the said Walter H. Harrison, Jr., on or before the 20th day of October." That order was on January 25th, 1934, made final. These appeals are from those orders.

From the pleadings it is apparent that there was no money consideration for the Harrison mortgage, but the issue was whether the actual consideration therefor was to afford Harrison security for the payment of a commission of $5,000 on the sale of the Robinette property if he sold it for $30,000, as appellees contend, or whether it was to secure to Harrison the payment of a counsel fee of $5,000 for representing the Robinettes in an equity suit of Dorothy Robinette et al. v. the Chesterfield Company et al., the purpose of which was to set aside the deeds from the Robinettes to Messersmith and from Messersmith to Queen, as he contends.

The first negotiations between Harrison and the Robinettes occurred in July, 1932, when he and they were

staying at Love Point, Maryland. At that time there were outstanding against the Hanover Street property mortgages aggregating $7,500, on one of which, the first, payments had been made, and the Robinettes had conveyed away their equity in the property in a deed to Messersmith. The property at the time was leased as a filling station to the Texas Company at a rental of $2,400 per year, under a lease which was about to expire, and under which the lessee had an option of buying it for $30,000. The appellees were in serious financial difficulties; at least one of the mortgages was in default, and foreclosure proceedings were imminent.

The affairs of the Robinettes were in that situation when, either at their invitation or upon his offer, negotiations between them and Harrison began. John H. Robinette, Jr., referring to the execution of the note and mortgage, said:

"At the Love Point Hotel. We were talking in the hotel, and he had overheard a conversation about the filling station being in danger, and being a good Samaritan and knowing my daddy he came to the rescue and he said he would get us $30,000 and save the property for us. That was all we had left, and he was going to get us $30,000 for us. At that time we were in pretty bad circumstances and they were going to foreclose, and he was going to save the station and get us $30,000, which was very agreeable. We did not actually employ him. He just happened to be a guest at the hotel and overheard the conversation and picked the case up himself and continued on with the case, and the consequence was he did not do anything as far as saving the station. * * * "What agreement was reached as to a fee to be paid to Mr. Harrison last summer at this Love Point Hotel? A. Your Honor, Mr. Harrison from the beginning said if he would get $30,000—that was the understanding from the beginning to end would it be agreeable to give him a $5,000 fee, which is an enormous amount, but under the circumstances if we would get $25,000, $5,000 was not so bad at all, so we agreed to give him $5,000 if he could get $30,000."

Following that, John H. Robinette, Jr., and Arthur Graham Robinette executed first a confessed judgment note, and then a mortgage, under circumstances which the same witness described in this way: "Mr. Harrison advised us to come to his office, and he said, 'Well, to insure some surety of my fee I am going to have you and your brother and sister sign a confessed judgment.' That was very agreeable, and we signed that, and he went on to relate how we should not have any trouble, and talked to us as an advisor and an attorney should, and of course we listened to him and signed everything that was put before us. Inasmuch as he was a prominent lawyer and we were his clients, we just abided by his advice. "Q. Were there any other papers signed after you had signed the confessed judgment note? The Court: What was the date of it? Q. When was that confessed judgment note signed? Mr. Harrison: October 24th, 1932, was the note. The Court: And the mortgage? Mr. Harrison: Later—November 10th."

At that time Dorothy Robinette, as a result of some mental disorder, was staying at St. Carlotta's Institution at Jefferson, Wisconsin, and the mortgage was sent to her for execution. The "Sister Superior" of the institution declined to permit her to execute it, and Harrison then arranged to have her brought to Baltimore, and that was done. Of that incident, Arthur Graham Robinette, referring to Harrison, said: "He gave me and my father thirty-five dollars and I went out in the machine and he said, 'Do you think thirty-five dollars will be enough,' and I said, "Yes,' and we went out in the machine and brought her back, and it took us about four days."

John H. Robinette, father of Dorothy, John H., Jr., and Arthur Graham Robinette, said: "Did you go after your daughter in Wisconsin? A. Yes. Q. At whose request? A. At Mr. Harrison's request. We found we would save money by bringing the girl here. The Sisters refused to allow any of their scholars to sign any papers unless we had a committee appointed and some one appointed a commissioner, and Mr. Harrison advanced the money.

We were so desperately short of money, and Mr. Harrison advanced it, and we went out there. I told him in the beginning we did not have enough money to go. We brought her back."

He and Arthur, his son, corroborated in substance the version of the transaction given by John H. Robinette, Jr., which was also corroborated, as to appellees' agreement to pay Harrison $5,000 for selling their property for $30,000, by two other witnesses, B. H. Somers and Steuart England, who said they were present when that contract was made.

While Harrison flatly denied that the consideration for the mortgage to him was a commission conditioned upon his effecting a sale of the Hanover Street property for $30,000, his testimony is too evasive, incoherent, and confused to afford any real support for his contention that it was an attorney's fee for representing appellees in an equity suit.

The only litigation, or cause for litigation, in which the Robinettes were interested, to which there is any intelligible reference in the record, grew out of the Chesterfield mortgage. The facts of that transaction were these: One Greenblatt, a real estate broker, represented that he could sell the Hanover Street property, and approached Morris Macht and offered to divide commissions with him if he, Greenblatt, could effect a sale, but told Macht "that in order for him to get authority to sell it," it was necessary to raise $500 forthwith, and Macht agreed to lend the Robinettes that money. While the transaction was screened by a fog of fiction and misleading documents, it appears to have been this: Macht loaned the money, and to secure its repayment took a mortgage in the name of the Chesterfield Company, and then, to secure himself in the collection of any commissions which Greenblatt might earn if he sold the property, he took deeds through Messersmith and Queen for another of his companies, the Thomas Company. While those deeds were absolute in form, it was understood by Macht and the Robinette brothers that they were in fact merely collateral security

to protect Macht in the collection of his share of any commissions Greenblatt might earn; but it is open to doubt whether Dorothy Robinette either understood or could have understood those transactions. The litigation which Harrison proposed and eventually conducted was to set aside those deeds, and that is the service for which, he testified, he was to be paid the $5,000 fee secured by the mortgage.

While the selling price of the property was fixed in the lease to the Texas Company at $30,000, Harrison said that that figure was fictitious, and that its actual value had been appraised at $14,000. There was no contention on the part of the Robinettes that the principal secured by the Chesterfield mortgage was not a *bona fide* obligation, nor is there any evidence that either they or Macht regarded the Messersmith deed as anything more than security to protect Macht in collecting his share of any commission that Greenblatt might earn for selling the property. There is not the slightest evidence that Harrison's standing, experience, or ability justified so extraordinary a fee for any service that could be rendered in an attack upon that deed, and his own testimony emphasized that conclusion.

It further appears from his testimony, as well as from theirs, that the Robinettes were in dire need of money for even the merest necessities, and that from time to time he advanced them money, and that in particular he advanced or loaned Arthur Robinette small sums, for which Robinette turned over to him pawn tickets for a watch, a diamond ring, a silver tea set, and a silver plaque of the "Lord's Last Supper," which Harrison apparently still holds.

The relations between Harrison and that particular Robinette are shown in these extracts of his cross-examination by Harrison: "'Was my agreement to give you these moneys and carry you all on? No, you gave that out of your own free will. And now you come in here to deprive me of getting my money, would you not? A. You are taking the bread out of my baby's mouth and my wife

—all we got in the world. * * * The whole thing is, you were really treated very nice by me, were you not? Come on and come out with it. A. Yes, but you were to your own advantage. That is why you were giving it to us."

Referring to an occasion when the elder Robinette and his sons had gone to Harrison's office to protest against his claim, he had asked Arthur if he did not recall that he, Arthur, had said that Harrison was to get $5,000, and the following occurred: "Yes, I said he was supposed to get $5,000, and you said you were not going to get anything for us or yourself, and you were arguing with my brother, and you said, 'If he wants to fight I will fight it out to the finish', and you said to me, 'Don't you go over and sign any papers, you leave it to me, I will see that you are taken care of.' Q. I said, 'Don't double cross me or anything, because if you do I would not give you a cent, I am holding the bag? A. You said you were holding the bag long before the case. Q. Am I not still holding the bag? A. And you said if the station don't bring $30,000— Q. I don't remember saying that. That is the only thing you have on your poor mind. Didn't you get the idea of $30,000 for that station out of the original lease with the Texas people, the option they had to buy it— A. That was the lease they made up five years ago."

It also appeared that Harrison had attempted to refinance the property and actually succeeded in having Carozza advance money to buy the second mortgage, but that he was unable to prevent a foreclosure, and the property was eventually sold.

In considering those circumstances, weight must be given too to the further fact that the relations between Harrison and the Robinettes were those of attorney and client, and that one of his clients was a girl in an institution maintained for the treatment of the mentally deficient; that the mortgage and judgment note were drafted by him, and signed by them at his request.

Upon those facts Harrison's contention that the Robinettes agreed to pay him $5,000 in connection with the litigation to annul the deeds to Messersmith and Queen is in-

herently incredible, and must be rejected. So that the only possible conclusions are that the consideration for the mortgage was either a commission for the sale of the property, or security for any legal services which he might render in refinancing the loans on the property, in setting aside the deeds to Messersmith and Queen, in preventing a foreclosure of outstanding mortgages, and possibly in procuring for the Robinettes additional loans.

Unquestionably Harrison gave valuable service to the appellees, extending, as he testified, over a period of fourteen months, and it is also clear that from time to time he advanced money to them. In view of his conduct and admissions, it might well be inferred that the mortgage was executed to secure the payment of whatever such services might reasonably be worth, as well as the repayment of such advances. But he himself definitely excludes that hypothesis from consideration when in his pleadings and testimony he insisted that the $5,250 named in the mortgage was a single indivisible fee for conducting litigation affecting the Messersmith and Queen deeds. Such a fee was so wholly out of proportion to the value of any services which could possibly have been rendered in that litigation that, in view of the relationship between Harrison and the mortgagors (6 *C. J.* 686; *Etzel v. Duncan*, 112 Md. 346, 76 A. 493), the evidence offered by him cannot be accepted as sufficient to establish it as a present subsisting consideration for the mortgage. So that the only possible conclusion, and one which is supported by the weight of the evidence, is that the mortgage was given to secure the payment of a $5,000 commission to Harrison if he effected a sale of the Hanover Street property for $30,000; and, as that consideration failed, the mortgage became void.

It follows that the appellant was entitled to no allowance, based upon the mortgage to him, out of the surplus funds in the hands of the court, nor, as a simple contract creditor, was he entitled to any allowance out of these funds. *Wiltsie on Mortgage Foreclosure* sec. 858. If, therefore, the mortgagors had appealed, it would have

been necessary to reverse the orders from which these appeals were taken. But they did not appeal, and although the appeals were argued in this court as though the appellees were in fact appellants, they cannot be so recognized. So far as the record discloses, they were satisfied with the orders from which the appeals were taken, and certainly, since they did not appeal from them, they cannot question their propriety in this court.

Since the appellant was in law and in fact entitled to nothing at all out of the surplus funds in the hands of the court, he was certainly not injured by the orders which allowed him $2,000, and if the orders appealed from may be reviewed by this court, they must be affirmed, for injury and error must concur to justify a reversal, and a decree may not be reversed for the benefit of one who did not appeal therefrom, even though as to him it was both erroneous and injurious. *Frederick County v. Page,* 163 Md. 631, 164 A. 182; *Gordon v. Miller,* 14 Md. 204; *Lanahan v. Latrobe,* 7 Md. 268; 4 *C. J.* 697.

But in this case appellees contend that under Code, art. 5, sec. 42, the case may be remanded in order that what was as to them a manifest error may be corrected. We do not so construe that statute. Its apparent purpose was not to relieve a party seeking to have an erroneous decree or order reviewed by this court from the necessity of appealing therefrom, but to confer upon this, as an appellate court, the power to remand in cases properly before it, in which, because of some defect or omission in pleadings, proof, or parties, the proceedings are so far incomplete as to preclude any final, just, and complete adjudication of the rights of the parties. The only case cited by appellees in support of their contention, *Greer v. Baughman,* 13 Md. 257, affords an apt illustration of that construction. In that case Mrs. Greer filed a bill to sell real estate which she claimed was held by George Baughman and his alienees under a resulting trust in her favor. Baughman's creditors claimed that the property was subject to their claims. The property was sold under an agreement and the fund brought into court. The

court dismissed Mrs. Greer's bill, and she and Baughman's alienees appealed. This court decided adversely to the appellants' contentions, but, instead of affirming the decree, remanded the case that the fund arising from the sale of the property, and which stood in its stead, might be divided among the creditors according to their several priorities, which had not as *inter sese* been theretofore considered. If the lower court had awarded the fund to Mrs. Greer, and the appellate court had awarded it to the creditors on the appeal of the Baughman alienees, there being no appeal by the creditors, the case would have been in point, but since it was otherwise, it fails to support appellees' construction.

Certainly that must be so, for the postulate that a case may be remanded at the instance of an appellee in order that an error which did not injure the appellant may upon the same record be corrected, is not only contrary to such cases as *Gordon v. Miller, supra,* and *Lanahan v. Latrobe, supra,* decided long after the Act of 1832, but contrary to the long established practice of this court, and repugnant to the reasoning underlying those cases. If no appeal had been taken at all, or if after an appeal was entered the appellant dismissed it, the orders appealed from would have remained valid and subsisting adjudications. There is no sound reason why any different result should follow because the orders injured the appellees, who, having the right to appeal, failed to exercise it, when the error did not injure the appellants. *Smith v. Hooper,* 95 Md. 35, 51 A. 844, 54 A. 95; *McElderry v. Shiley,* 2 Md. 37; *Pratt v. Johnson,* 6 Md. 399.

We find no merit in the contention that the orders were not final in their nature and therefore not appealable. Since they finally disposed of a fund in court for distribution, after pleadings, evidence, and hearing, it cannot well be said that they did not finally adjudicate the rights of the persons interested in that fund. Code, art. 5, sec. 31, as amended by Acts 1927, ch. 593.

The orders appealed from will therefore be affirmed.

*Orders affirmed.*