## GLEN ALDEN CORPORATION, ET AL. *v.* DUVALL, ETC.

[No. 217, September Term, 1964.]

406

*Decided November 17, 1965.*

*Motion for rehearing or modification of opinion filed December 14, 1965, denied January 3, 1966.*

The cause was argued on May 6, 1965 before Horney, Marbury, Sybert, Oppenheimer and Barnes, JJ., and was sub-

mitted on the brief on November 12, 1965 to HAMMOND, HORNEY, MARBURY, OPPENHEIMER, BARNES and MCWILLIAMS, JJ., and EVANS, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Stedman Prescott, Jr.,* for appellants.

*John P. Moore,* with whom were *Wheeler, Moore & Korpeck* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellee, R. Byng Duvall, operating Duvall Engineering Company (Duvall) as a sole proprietorship, filed an action at law against Glen Alden Corporation (Glen Alden) and its subsidiary corporation Republic-Transcon Industries, Inc. and Republic Air Conditioning Co. in the Circuit Court for Montgomery County on August 21, 1961. The declaration included the seven common counts in *assumpsit* and one special count in which recovery of $110,153.83 with interest from January, 1960 and costs was sought resulting from the alleged breach of contract between Duvall and The Mathes Company (Mathes), a subsidiary of Glen Alden, whose assets were subsequently acquired by Republic Air Conditioning Co., (Republic). On November 26, 1962, Republic filed an action at law in the same court against Duvall in two counts in addition to the seven common counts, to recover in count 1, $10,099.55, the principal balance allegedly due on 16 promissory notes from Duvall to Mathes and assigned by Mathes to Republic, together with 6% interest of $928.30 from December 31, 1961 and attorneys' fees of $1550.80 provided for in the notes and to recover in count 2 for a balance of $1,682.32 on an open account with interest of $84.00 from December 31, 1961. In the exhibits attached to the declaration it appeared that the original note account was for $18,567.18 from which was deducted $8,467.63 consisting of the alleged market value of the various air conditioning units recovered from the custody of the Sheriff of $11,911.20 less the costs of $3,443.57 involved in an attachment on original process issued by Duvall,

but later quashed by Judge Shure on June 21, 1962. In both actions, the defendants filed the general issue pleas in *assumpsit*.

The two cases were consolidated for trial and tried before Judge Shure, sitting without a jury. After much testimony and the introduction of a number of documentary exhibits, Judge Shure, after argument of counsel, filed an opinion and directed the entry of judgment for Duvall against Glen Alden and Republic for $27,735.00. It is from the judgment for this amount that the present appeal was taken by Glen Alden and Republic. There was no cross appeal by Duvall.

For convenience in the later consideration of the case we will indicate the particular claims alleged in Duvall's declaration and the allowances (or disallowances) made by the lower court on those claims:

| Duvall's claims<br>Nature of claim | Amount<br>claimed | Result in<br>lower court |
|---|---|---|
| Freight on returned in-warranty parts | $ 990.52 | Disallowed |
| Unpaid claims for labor allowances for in-warranty repairs | 2,890.48 | $ 1,445.00 |
| Unpaid amounts for in-warranty parts returned to Mathes | 13,079.63 | 6,540.00 |
| Rent on warehouse housing equipment | 2,430.00 | 3,000.00 |
| Interest and insurance charges on warehouse equipment | 2,083.12 | Disallowed |
| 20% down payment on equipment | 4,287.13 | 4,287.13 |
| Bonded warehouseman's salary | 4,427.95 | Disallowed |
| *Value of unexpired five year warranty | 79,965.00 | Disallowed |
| | $110,153.83 | |

*Allowed by trial court:
Additional credit allowed on returned equipment 14,321.04

29,593.17

Credit for attachment and
repossession costs               3,427.47

                                     26,165.70

Interest at 6% on balance           1,569.30

         Judgment for                $27,735.00

Duvall had entered the building, heating and air conditioning business in Montgomery County after the conclusion of World War II. In the latter part of 1957 he became interested in the air conditioning and heating equipment for Mathes. Mathes at that time had its factory at Forth Worth, Texas and had a local representative, a Mr. Morton.

Duvall's original conversations were with Curtis Mathes, president of Mathes. Duvall visited the Mathes plant at Fort Worth and became familiar with its installation. Mathes had a warehousing subsidiary, the Maco Corporation (Maco) which had two warehouses in Montgomery County, one on Elkins Street in Wheaton and the other on Howard Avenue in Kensingston. The Howard Avenue warehouse, of masonry construction 20 feet by 70 feet, was owned by Duvall. Maco and Duvall entered into a written warehousing contract, lease and unconditional guaranty by Duvall on November 19, 1957. The agreement provided for a non-recurring fee to the warehouseman (Maco) and for branch warehouse charges of 1/10 of 1% of the stated value of the commodities stored. There was a minimum annual storage charge of $100.00. Insurance charges were payable in advance as invoiced. The agreement was for 3 years from November 19, 1957, with a provision for subsequent 3 year renewals unless either party terminated upon 90 days' written notice prior to the end of the 3 year period. The lease, however, provided for a term from year to year with a rental of $1.00, with the right of either party to terminate upon 30 days' written notice with appropriate provisions to protect existing warehouse receipts. The unconditional guaranty by Duvall indemnified Maco against loss resulting from the fraudulent or dishonest acts of any employees or agents of Duvall in connection with the warehousing agreement and lease. There was an oral agreement between Mathes and Duvall whereby

Duvall became an "Associate Manufacturer" of Mathes and which provided that Duvall would supply a warehouse in Montgomery County (which was accomplished by the documents of November 19, 1957) ; that Duvall's purchase terms for Mathes equipment would be subject to the customary discounts and would be paid for by a down-payment of 10% in cash and a promissory note or notes for the 90% balance. Mathes would prepay the freight from its plant to the warehouse in carload lots. Payment was made by Duvall at the time of receipt of the equipment from the warehouse for sale or installation. He would pay the warehouseman for such equipment in cash and the warehouseman would then send the funds to Mathes to be applied against the promissory note or notes theretofore given by Duvall. The Mathes air conditioning equipment was sold under a written two-fold warranty. The first part of the warranty was entitled "One Year Complete Air Conditioning Warranty" (One Year Warranty) and warranted to the original purchaser that the described Mathes Air Conditioner would be "free from defects in material and workmanship under normal use and service for a period of one year from the date of installation." It further provided that Mathes' obligation under the One Year Warranty "shall be limited to furnishing, free of charge, F.O.B. factory, to the original purchaser a replacement part or parts of like or similar design and capacity in exchange for return to Mathes factory, freight collect, any part or parts of the Air Conditioner that in Mathes' judgment show evidence of defect in material or workmanship." The Five Year Warranty provided that, in addition to the One Year Warranty, Mathes warranted to the original purchaser as follows :

> "* * * [T]he base and the condenser coils, evaporator coils, and compressor to be free from defects in material and workmanship for a period of six (6) years from date of shipment by the Mathes factory or five (5) years from date of original unit installation, whichever shall first occur. This additional warranty does not cover such items as (but is not limited to) refrigerant, electrical components, or electrical controls.

"The responsibility and obligation of The Mathes Company, Inc. under this warranty is limited to the actual repair and/or replacement, and/or the removal and reinstallation of any of the above components which in the judgment of Mathes show evidence of defects in material or workmanship. On defective parts Mathes will pay freight one way to its Fort Worth factory. All new or repaired parts will be shipped freight collect by Mathes. This warranty does not obligate The Mathes Company, Inc. for any labor incurred for removal of ducts, partitions, etc., to permit replacement of any components in the unit."

The two warranties are declared to be in lieu of any other warranties express or implied, are limited to the continental United States and only apply if the enclosed Registration of Warranty Card is mailed within 30 days after installation.

At the bottom of the warranty there is a provision for "Associate Manufacturer Warranty" which provides in effect that the Associate Manufacturer (who signs the warranty at the bottom of the document) gives an additional warranty as that of Mathes, and provides that:

"[I]n addition it is understood that associate manufacturer's obligation under this warranty is limited to the actual removal, reinstallation, repair and/or replacement of the Refrigerant System or a part thereof at the point of installation without cost to the purchaser, and the associate manufacturer does not authorize anyone else to remove, repair, or replace this refrigerant system or incur any cost in connection therewith."

It was also provided that Mathes assumed no liability under the warranty unless the Associate Manufacturer signed the warranty in the place provided for his signature.

The controlling interest in The Mathes Company was acquired by Glen Alden as of January 1, 1958. Thereafter, Duvall and John J. Hildebridle, who was then the president of Mathes, had conversations at Forth Worth on March 15, 1958 and a telephone conversation with Robert B. Starnes (Starnes),

a field sales representative of Mathes, in regard to Duvall's purchasing arrangements with Mathes. These arrangements were confirmed in writing by Duvall in a letter to Mathes dated April 14, 1958. Certain difficulties between Duvall and Abbott Refrigeration were resolved as follows:

"1. That I would continue as an Associate Manufacturer buying commercial equipment at 20% discount from Distributor Price.

"2. That my commercial equipment cost would be the same as Abbott's and that Abbott would not be given a profit on my business.

"3. That this arrangement would exist for one year.

"4. That I would continue to operate a MACO Warehouse."

The future dealings with Mathes were outlined as follows:

"1. That I will continue as an Associate Manufacturer buying at 20% discount from the Distributor price and with the same terms that prevailed on past orders.

"2. That I would continue to maintain my MACO Warehouse.

"3. That Abbott Refrigeration Company will have a five percent price advantage over me and that they will realize 5% profit on all my business.

"4. That in consideration of this 5% override on my business, Abbott Refrigeration Company will sell commercial equipment to me at 15% off of Distributor price, which is 113.34% of their cost, F.O.B. their warehouse, Washington, D.C. Abbott will also maintain a complete stock of parts which will be available to me at factory price.

"5. I cannot buy Window Units from the Mathes Company direct.

"6. That I would not set up any more Dealers in the territory given to Abbott Refrigeration Company. This territory includes the District of Columbia, Counties of Montgomery and Prince George's in Maryland, and Arlington, Fairfax, and London, including the City of Arlington, in the State of Virginia."

Duvall requested that "in line with your recent bulletin" he would appreciate an early written confirmation of the terms outlined in the letter. This was forthcoming in a letter of April 23, 1958 from the president of Mathes to Duvall in which it was stated in part:

"This letter will confirm our working agreement with you as outlined in your letter of April 14th.

"The only thing that I would add is a clause in which this arrangement can be terminated by either party with a 30 days' written notice."

After this exchange of correspondence, Mathes on May 9, 1958 issued to Duvall, Bulletin, Register No. 622, which has the general heading "Marketing-Mathes Air Conditioning Products." It has the index number C:14.0 and in the blank provided "Replaces No. ........," there is no entry, so that it is apparently the original form of this type so far as Duvall is concerned. It is quite a substantial document consisting of 34 letter-size pages of single-spaced printing. Some of the pages are printed on both sides of the page. It is generally divided into five principal headings: I, Marketing Plan for 1958, II, The Product (further subdivided into A, The 1958 Commercial and Residential Line, and B, The remote air conditioning equipment line), III, The Distribution Pattern (including selling methods and distribution), IV, General Conditions of Sale, Prices, Discounts and Terms of Payment, and V, Orders, Warehousing, Stock Shipping and Transportation Costs.

So far as relevant here, the Bulletin provides:

1. That the marketing plan shall apply for the calendar year 1958 unless terminated sooner.

2. That Duvall as a Distributor-Dealer (which encompasses the Associate Manufacturer) shall provide room air conditioner installation and service and the Distributor-Dealer will be bound by the policy and procedure set forth in the plan, and that "Any revision, modification, or abrogation of the policies, methods and procedures delineated in this plan will be issued in writing by The MATHES Company at its Home Office in Fort Worth, Texas."

3. "Title of ownership" passes to the Distributor-Dealer up-

on delivery of the merchandise by Mathes to the carrier at the Mathes shipping point; Mathes retains a lien on all merchandise to secure payment in full.

4. Commercial equipment may be purchased by the Distributor-Dealer on the basis of the Mathes price list dated March 1, 1958 and is entitled to a 20% discount of the prices shown on that list.

5. As to all Mathes products: Effective on and after February 20, 1958, the commercial units ordered under the Maco Warehousing or Public Warehousing Plan from Mathes will be billed on the basis of a 10% down payment in cash to be returned with an executed 90% note, tally sheet and warehouse receipt. The interest rate is 6% per annum on the notes.

6. All orders are to be signed by the customer and mailed to the Fort Worth office on a Mathes form; "Orders signed by a Mathes Sales Representative will not be accepted as bona fide orders."

7. The territory in which Duvall is located is "Territory No. 62 (Washington, D. C.—Baltimore, Maryland)," in which John T. Bennett, Falls Road, Cockeysville, Maryland, is designated as Sales Representative.

The Bulletin sent to Duvall on May 9, 1958 was supplemented by a Bulletin dated July 1, 1958 in regard to Residential and Commercial Equipment and received by Duvall, which confirmed the existing warranty (the One Year and the Five Year Warranty—called in the Bulletin of July 1, 1958 an "Extended Four Year Warranty"). The extended warranty covers the sealed refrigeration system, the phenolic base and phenolic mid-section against defects in material and workmanship, and repairs of these portions of the units are to be handled in the field in the same manner as during the One Year Warranty. Charges for hermetic repairs may be billed to Mathes at any time during the five year period, but will not be honored if made within the one year period from date of installation. This Bulletin also states that Mathes will honor in-warranty charges by Authorized Mathes Installing Dealers after one year from the original installation for change-out of compressors, condenser coils, evaporator coils, and reversing valves being contained within the housing of Mathes units—"as a re-

sult of mechanical failure due to faulty material or workmanship," as follows:

| | |
|---|---|
| "Models 24-28-34 Units | $30.00 |
| Models 40-50-62 Units | 37.50 |
| Models 90 and 120 Units | 47.50" |

The Distributor-Dealer was responsible for transportation costs one-way only during the first one year warranty period; Mathes paid the transportation costs one-way during the second to fifth year of the warranty.

A similar Bulletin, dated June 1, 1958 in regard to Room Air Conditioners had also been received by Duvall. After the first year of the warranty period, all field service reports, including both parts and labor, are to be charged to the customer.

Mathes prepared two forms for use by Duvall in returning parts. One of these was a "Return Parts Tag," attached to the specific part returned. It bears a number, and has spaces in which the name of that part, its number, its form model, and its serial number, the dates of installation and replacement, the customer's name, address and the name of the person by whom the part is returned. There is also a space for designation of "Nature of Defect." At the bottom of the form, the user of it is warned that "No credit issued without this tag completely filled out" and "Allow 30 days minimum for factory processing and issuance of credit."

The second form is entitled "Material Return Tag Tally Sheet." This has spaces in which are to be inserted the number of the form, its date, the name and address of the sender, and then three columns, one for the Return Parts tag number, the second for a description of the part, the third for the cost of the returned part.

Using plaintiff's Exhibit No. 45 as a typical example of the Return Parts Tag, we find that it bears number 18225, involved a "Compressor," Part No. 4426416 from Model No. 5HAR3BHP, with Serial No. 475185. The compressor was installed in October 1957 and was replaced on October 16, 1959. The customer's name and address is given, as well as Duvall's name and address as the person by whom the compressor is returned. The Nature of Defect is stated to be "Grounded Windings."

Using plaintiff's Exhibit No. 44 as a typical example of a "Material Return Tag Tally Sheet," we find that it bears number 6, and is dated November 25, 1959. It has Duvall's name and address and under the three columns mentioned there are 14 separate items headed by the compressor mentioned in the Return Parts Tag above described (plaintiff's Exhibit 45) as follows:

"18225   4426416    Compressor    $429.66
[The remaining 13 separate items follow with their dollar amounts; then follows:]

|  |  |
|---|---|
| Total | 3,384.75 |
| Less 40% | 1,353.90 |
| Net Credit Due | $2,030.85" |

It is seen from these forms, prepared by Mathes, that the Associate Manufacturer/Distributor-Dealer (Duvall), who installed the equipment and who serviced the equipment for the ultimate purchaser, certified in regard to the nature of the defect in the part, which, *prima facie,* was a defect covered by the warranty. The specific part was then returned to Mathes, with other parts, with their cost price as the value for credit, less the 40% discount, given to Duvall as a Distributor-Dealer, and the net amount is stated to be the amount of the credit to which Duvall, as Distributor-Dealer is entitled.

This procedure for the return of equipment under the warranty was regularly followed by both Mathes and Duvall. Duvall testified, without contradiction, that the relationships between him and Mathes were mutually satisfactory from the beginning of his agreement until the middle part of 1959. He had a competent service manager and adequate technical help and equipment. Although not required to do so under the agreement, he purchased a Mathes "charging board" to test each installation. During this period, at the oral request of an officer of Glen Alden, Duvall acted as Mathes' field representative in the area. Its former field representative had been withdrawn. This additional service was performed by Duvall without compensation. During this same period practically none of the credits requested by Duvall for returned equipment and parts was denied by Mathes. Out of 54 compressors returned (compres-

sors are the most essential portion of the refrigeration unit and most likely to give the most trouble), there was only one denial which Duvall could recall.

In the latter part of 1959, an abrupt change in the pleasant relations between the parties occurred. Duvall's requests for returned equipment and parts were ignored for substantial periods of time, in some instances a period of 6 months or more, and after much correspondence. Duvall, in November 1959, was approached by Mathes to increase his 10% down payment to 20%. In order to "avoid unpleasantness," Duvall agreed to do this, and paid $3,128.98 on equipment already received. Duvall also discovered that he was being shipped new equipment with old compressors. For several months as the result of an attachment issued in connection with an action of the Eastover Corporation against Glen Alden and Mathes (Duvall was not a party to the case), Duvall's warehouse was padlocked and he could obtain no equipment from it. Duvall could not pay Mathes any money because his funds had been garnished. Mathes then put Duvall on a C.O.D. basis and claimed that Duvall owed Mathes $9000 on the note account when, according to Duvall's records, Mathes owed Duvall a small balance.

On March 8, 1960 Duvall shipped to Mathes three compressors and miscellaneous parts weighing in excess of 100 pounds, freight collect. Mathes refused to accept the shipment and Duvall sent a telegram on March 22 to inquire why the shipment had been refused. Mathes, in its telegram of March 25 advised that the shipment was refused in accordance with its Bulletin MX206-5, dated January 25, 1960, revised January 27, 1960. On the same day Duvall wired back that he had received no such Bulletin and to send the Bulletin to him. The Bulletin and revision reached Duvall on April 12, 1960, which the evidence establishes, was the first time Duvall had seen these documents.

The Bulletin of January 25, 1960, as revised on January 27, 1960 purported to make substantial changes in Mathes' relations with its Distributor-Dealers. The labor allowance was discontinued entirely. Mathes would no longer pay for freight one-way and the Five Year Warranty was terminated. In lieu of it, for units installed after January 25, 1960, there was a Four Year Compressor Replacement Warranty Agreement, which

applied only to compressors returned with freight prepaid to be replaced by Mathes, freight collect, if inspection revealed that a defect actually existed in material and workmanship.

In a letter, dated May 16, 1960, to Mathes (received by Mathes on May 19), Duvall wrote, in part, as follows:

> "With your new restrictive warranties and the changes you created, the value of the equipment has decreased. It places a financial burden upon me which was previously your burden and was included in the original transaction between us. Based on my service records, the previous warranty is worth in excess of 50% of the original factory price of the equipment purchased under it. Incidentally, the equipment I sold was sold with the prior warranty in effect.
>
> "As a result of your policy or warranty changes, I have no alternative but to demand that I be returned to a status quo position. By this I mean that any and all equipment ordered from you prior to your policy and warranty change, be returned to the factory (at your expense) and any notes or charges incurred by me be cancelled, and that my payments be returned and expenses incurred by me be reimbursed. Naturally, your warranty on the equipment I sold under pre-existing contracts will continue in full force and effect as originally made by you.
>
> "Until I definitely know that the attachment levied by the Sheriff is dissolved, I have no alternative but to retain in my possession any chattel or credits which I might have or which might accrue to you during the course of normal business."

There were conferences and correspondence between Duvall and Mathes in an effort to settle these differences but these efforts were unavailing.

On June 1, 1961, Republic acquired the assets of Mathes and on July 7, 1961, Duvall was advised of this and was further advised that, in regard to the warranty, any obligation of Republic "is limited to the replacement 'exchange' of defective component parts, provided such defective component parts were,

in Mathes' final judgment, actually defective in original material and workmanship." It further stated that "We cannot be responsible for labor, freight, or the price or cost of parts furnished by any distributor, jobber, dealer or others." Republic denied any credits claimed by Duvall on in-warranty replacements on the ground that Republic had purchased "assets only." On July 29, 1961, Republic made demand on Duvall for payment of Duvall's open account and notes to Mathes in an alleged balance of $19,631.62. Duvall wrote Mathes on August 9, 1961 and advised it of the receipt on August 4 of the Republic letter of July 29; that Mathes had breached its contract with Duvall on January 25, 1960 by its drastic change in its warranty; and, demanded 14 items of damages in the total amount of $110,153.83. (These are the same items which were later set forth in Duvall's declaration.)

Duvall ordered no new equipment from Mathes subsequent to April 12, 1960. After Duvall's attachment was discharged on June 21, 1962, Republic had the Sheriff release all of the equipment in the warehouse to it and took possession of it on July 24, 1962.

Glen Alden and Republic, the appellants, urge a number of alleged errors by the lower court. These may be considered under three general headings:

I. There is no liability at all on the part of Glen Alden and Republic because (a) Duvall failed in its proof to show any breach of the contract by them (b) Duvall first breached the contract himself, (c) Duvall waived any breach, and (d) Mathes had the right to modify the contract which prevented liability for a breach.

II. The trial court erred in admitting certain testimony.

III. The damages were erroneously calculated by the trial court (a) in theory and (b) upon the facts in the case.

We will state facts in addition to those already stated as we consider the issues raised. Before considering the issues specifically, we should point out two principles which generally apply in this case. These are: 1) As the case was tried by the lower court without a jury, we will not reverse the decision of the lower court upon the facts unless that determination is clearly erroneous, and due consideration will be given to the

opportunity of the lower court to judge the credibility of the witnesses. Maryland Rule 886 a. *Johns v. Director,* 239 Md. 411, 211 A. 2d 751 (1965). 2) Duvall, the appellee, took no cross appeal in this case so that we will not reverse upon rulings of the trial court adverse to Duvall which we might otherwise consider erroneous and prejudicial to him. *Reece v. Reece,* 239 Md. 649, 212 A. 2d 468 (1965) ; *Harrison v. Robinette,* 167 Md. 73, 83, 173 Atl. 60 (1934). See *Mezzanotte Constr. Co. v. Gibons,* 219 Md. 178, 183, 148 A. 2d 399 (1959). See also the cases collected in 2 M.L.E., *Appeals,* section 353.

## I.

We are of the opinion that the ruling of the trial court that Glen Alden and Republic had breached the contract with Duvall was not clearly erroneous.

## A.

The appellants contend that the evidence was insufficient to establish a breach of the contract because of the refusal by Mathes to give him credit for returned parts, claimed to be defective, to give Duvall the labor allowance for service in connection with those parts and because of the change in the warranty by the Bulletin of January 25, 1960. In our opinion there was sufficient evidence to establish the breach of contract for those reasons.

Although the contractual relationships between Duvall and Mathes were partly oral, partly written, and partly evidenced by the business practices between the parties, the trial court accepted Duvall's testimony in regard to the contract between the parties. His testimony is supported in substantial measure by the correspondence, documents and business practice under the arrangement. We have already stated the contractual arrangement and need not repeat it here. There is no doubt that Duvall was to be given credit by Mathes for defective parts, was to be paid the labor allowance in connection with these parts, Mathes was to pay the freight one-way and that the original warranty was of the essence in the contract as it was essential to Duvall, as Distributor-Dealer, in the marketing of the product. Duvall testified that the original warranty was

worth 50% of the list cost of the equipment and that without it, as originally given, he could not sell the equipment.

The appellant is correct in stating that the burden of proof was on Duvall to establish the breach of contract. Duvall had the burden of showing that the returned parts returned by him were defective before he could recover from Mathes. See *Slaska v. Idzi,* 186 Md. 530, 534, 47 A. 2d 503, 504-505 (1946). In our opinion, Duvall established the defects by his testimony, the testimony of William C. Sutton, the service manager of Duvall, the Return Parts Tags and Material Return Tag Tally Sheets, and the business practice between Duvall and Mathes in connection with the return of parts, the giving of credit for them and the giving of the labor allowance.

As we have noted, the forms and the procedure for the return of defective parts were established *by Mathes.* There was a section of the Return Parts · Tag in which the Distributor-Dealer set out the nature of the defect. This was done after the examination of the part by Duvall or his employees experienced in detecting these defects, upon its removal from the customer's installation, and this notation in this record kept in the ordinary course of business established, *prima facie,* that this was the defect. *Warczynski v. Barnycz,* 208 Md. 222, 230, 117 A. 2d 573, 576 (1955); *Bethlehem-Sparrows Point Shipyard v. Scherpenisse,* 187 Md. 375, 380-381, 50 A. 2d 256, 259-260 (1946). The evidence accepted by the trial court shows that for more than a year of actual operation under the contract, Mathes accepted in almost every instance, the determination by the Distributor-Dealer in regard to the defective character of the part. In other words, Mathes considered the determination by the Distributor-Dealer to be accurate and reliable. After a change in ownership of Mathes stock and some financial strain upon Mathes, refusals of credit because of alleged lack of defects under the warranty began to occur, but in our opinion, the trial court could properly find from all the evidence that Duvall had established the defective character of the parts and Mathes' refusals of credit for these parts and for the labor allowance were a breach of the contract. The forms were kept in the regular course of business and were properly received into evidence as we will indicate later. The appellants complain

that Duvall only had personal knowledge as to the condition of two items and that he should have offered an expert to testify in regard to the condition of the other items returned. This, however, goes to the weight of the evidence and the trial court could and did find that the evidence established the defective character of the returned parts. We cannot say that this finding was clearly erroneous.

The same comments are applicable to the contention of the appellants that there was no proof of a breach of the warranty. It is true that Mathes had the right to examine the returned part to determine whether it was defective under the warranty and, if Mathes did not act arbitrarily and capriciously, to disallow the credit if it found that the part, in fact, was not defective under the warranty. The evidence in regard to the purported rejections by Mathes in 1960 and thereafter, after substantial delays, was such as to justify the trial court in concluding that those rejections were arbitrarily and capriciously made. For example, in its credit memorandum of August 1, 1960, Mathes rejected compressor No. 18225, which had been replaced by Duvall on October 16, 1959 and submitted for credit in the Material Return Tally Sheet on November 25, 1959 with the comment "No credit" although in the Return Parts Tag attached to that condenser the nature of the defect was stated to be "Grounded Windings." There were similar uninformative statements in regard to other compressors, such as "General Condition Okay" or "moisture and acid." The testimony of Warner Calvin Pierson, who was field service supervisor for Mathes, and later for Republic for seven years from April 7, 1956 to April 7, 1962, rather indicated that those in charge of inspecting returned equipment, gave it rather cavalier attention. In our opinion, the trial court's finding that Mathes had breached the warranty was not clearly erroneous.

B.

The appellants contend that Duvall was guilty of the first breach of contract by failing to pay his notes and to make monthly payments on the open account, as well as by his alleged failure to fill out properly his labor allowance forms, prepare properly the compressors for shipment and his alleged fail-

ure to send returned parts and labor allowances in together or within the required 30 day period.

The evidence indicates that the notes were payable on demand after their date of execution and if no demand were made at an earlier date, they were due for periods ranging from 3 to 6 months from the date. Interest only was payable monthly and this was entered on the open account along with insurance charges on the equipment covered by the notes. There was no provision in the agreement between Duvall and Mathes for the open account. The practice was to apply Duvall's credits against the notes and the open account. There was evidence that when Mathes demanded payment of some $9000 of notes, it was actually indebted to Duvall for a small balance over and above the amount demanded.

The evidence also indicated that the occasional departures from the strict provisions of the contract in regard to filling out the labor allowance forms, the sending of return parts and labor allowances in together or within the 30 day period were not considered by Mathes as breaches of the contract. They were not insisted upon by Mathes and further performance by Duvall was accepted by Mathes. These rather unimportant departures from the strict terms of the contract were waived by Mathes. See *John B. Robeson Associates, Inc. v. Gardens of Faith*, 226 Md. 215, 222-224, 172 A. 2d 529, 533 (1961).

The appellants contend that Duvall waived the breach of contract by Mathes by continuing to service equipment after the breach, returning parts and claiming freight and credit allowances and using the old warranty certificate in the sale of equipment.

The evidence, however, clearly indicates that after the breach Duvall purchased no more equipment from Mathes. To mitigate damages he was obligated to service the Mathes equipment and continued to process claims in connection with this service on equipment acquired prior to the breach. This conduct is not inconsistent with the position of Duvall that there had been a breach of contract and did not amount to a waiver of the breach. See *Food Fair v. Blumberg*, 234 Md. 521, 531, 200 A. 2d 166, 172 (1964).

There were negotiations by Duvall to attempt to settle the dif-

ferences between the parties subsequent to the breach, but these negotiations were unavailing. They do not, however, constitute any waiver by Duvall of the breach by Mathes. See *Winfield Mutual Housing Corp. v. Middlesex Concrete P. & E. Corp.*, 39 N. J. Super. 92, 120 A. 2d 655 (1956). See also 1A Corbin, *Contracts*, § 216, page 301.

## C.

The appellants contend that the power in Mathes to revise, modify or abrogate the policies and procedures promulgated by the Bulletin of July 1, 1958 gave it the right to issue the Bulletin of January 25, 1960 and there could be no breach because of the substantial changes thus made in the existing contractual arrangement.

It seems clear, however, that any such change only applied to transactions arising after the issuance of the revising, modifying or abrogating bulletin and after notice of its issuance by Mathes to its Distributor-Dealer. Indeed, the Bulletin of January 25, 1960 contemplated such notice and provided for agreement by the Distributor-Dealer to be evidenced by his signature at the end of that Bulletin. It was not intended in the contract between Duvall and Mathes that the modification could be made by Mathes unilaterally and retroactively. By the Bulletin of January 25, 1960 as interpreted by the Revision of January 27, 1960, Mathes did intend to eliminate the freight and labor allowances on equipment already purchased and installed and to apply the new, revised warranty to equipment already purchased but *installed* after January 25, 1960. Mathes never did agree with Duvall that the old warranty would apply to equipment already purchased by Duvall and in his warehouse. Duvall requested that this be done in his settlement efforts, but, after requesting an inventory of equipment in Duvall's warehouse (which Mathes must have already had), Robert B. Starnes, in his letter for Mathes of June 29, 1960 to Duvall stated:

> "Upon receipt of your letter and expression of your thoughts along that line, we will then give immediate *consideration to the possibility* that we *could* confirm to you the extension of that particular coverage on that particular equipment." (Emphasis supplied).

No such confirmation was ever made and this letter shows that Mathes had attempted to apply the new warranty form retro-actively to equipment already purchased. This most certainly did not excuse its breach of contract as found by the trial court.

## II.

The appellants contend that the trial court erred in admit-ting testimony in two regards: A) in permitting the Return Parts Tags to be admitted and in permitting Duvall to read from these tags as to what the defect was on the particular equipment, and B) in refusing to permit Mr. Starnes to tes-tify to a comparison between credits and purchases made by Duvall.

## A.

In our opinion the Return Parts Tags, as records made in the ordinary course of business were properly admitted into evi-dence by the trial court. Code, Art. 35, Sec. 59. This remedial statute provides, in part, as follows:

> "*Any writing or record,* or a photostatic or photo-graphic reproduction thereof, whether in the form of an entry in a book *or otherwise,* made as a memoran-dum of *any act, transaction, occurrence or event,* shall be admissible in evidence *in proof of said act, trans-action, occurrence or event,* if made in the *regular course of business,* and if it was the regular course of such business to make such memorandum or rec-ord * * * *at the time* of such act, transaction, occur-rence or event, or *within a reasonable time thereafter.* * * * *All other circumstances* of the making of such writing or record * * * *including lack of* personal knowledge of the *entrant or maker,* may be shown *to affect the weight,* but not the admissibility thereof. The term 'business' shall include business, profes-sion, occupation and calling *of every kind.*" (Emphasis supplied).

See *Warczynski v. Barnycz,* 208 Md. 222, 230, 117 A. 2d 573, 576 (1955), *supra,* holding that field notes made by a surveyor in the regular course of his profession were admissible under

the Maryland Statute and *Bethlehem-Sparrows Point Shipyard v. Scherpenisse,* 187 Md. 375, 380-381, 50 A. 2d 256, 259-260 (1946), *supra,* holding that hospital records were admissible under this statute, and giving an excellent review of the history of the legislation, its purpose to broaden substantially the common law rule and considering prior Maryland cases. See also *Hance v. State Roads Commission,* 221 Md. 164, 169-170, 156 A. 2d 644, 646-647 (1959) and an interesting law review article by Robert E. Powell, entitled "Admissibility of Hospital Records into Evidence," 21 Md. L. Rev. 22, 30-34. These forms were prepared by Mathes and the testimony indicated that the information filled in them by Duvall was relied upon by Mathes as being correct in making allowances to Duvall. They *prima facie* established the truth of the matters set forth in the tags. The burden of coming forward with evidence to contradict the recitals in the tags passed to Mathes and the weight to be given any conflicting evidence was for the determination by the trial court. Maryland Rule 886 a.

## B.

Robert B. Starnes, who apparently was president of Mathes and who was employed by Mathes during the time Mathes was doing business with Duvall, testified that he had made notes for the year 1959 from recapitulations made from Mathes' records for 1957, 1958 and 1959 of all credits both for labor and for compressors returned for credit and credit granted during those years, to show figures pertinent to Duvall for the year 1959. When asked by counsel for the appellants what these notes indicated, the trial court sustained the objection of counsel for Duvall, on the ground that the records of Mathes were the best evidence. In our opinion, the objection was properly sustained. See *Brotherhood of Locomotive Firemen and Engineers v. Nash,* 144 Md. 623, 643, 125 Atl. 441, 449 (1924).

There was no tender of what figures Mr. Starnes would state so that it is impossible to tell whether the figures, even if otherwise admissible, would have any relevance to any issues in the case. See *Nicholas v. Owrutsky,* 230 Md. 60, 66, 185 A. 2d 498, 501 (1962). Cf. *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 129, 197 Atl. 580 (1938).

### III.

The appellants present a number of objections to the calculation of damages by the trial court both in theory and upon the facts in the case. We now turn to these objections.

### A.

The appellants urge that the trial court erred in attempting to return the parties to a *status quo* position. There is some confusion in the trial court's opinion in this regard. It is stated in the opinion:

> "Under the oral arrangements between the parties and the bulletins which had been initially furnished but thereafter changed, the Court holds that Duvall had the right to be returned to his previous position and that any contractual arrangements which theretofore existed between the parties were cancelled as of that date."

Later, however, in the opinion, it is stated:

> "The Court can now only hold that the testimony and the Exhibits clearly establish that the contract which Duvall entered into with Mathes to act as associate manufacturer concerning sale and installation of equipment with warranties, and including labor allowances which were thereafter discontinued amounted to a breach of contract on the part of the defendant company. Under the 30 day provision, all contracts were at an end no later than June 16, 1960. The contract having been breached, the plaintiff therefore has the legal right to provable damages, including credit for payment on the unsold equipment; and after the equipment secured by notes has been returned, he has the right to be relieved of his note obligation on that equipment * * *."

In our opinion there was no rescission of the contract for several reasons.

In the first place the contract was partly executed. Only a portion of equipment ordered pursuant to the contract remained

in the warehouse. When the contract has been partially executed, a rescission, in the correct and precise use of that word, is most unlikely to have been intended as the contract cannot, as a practical matter, be abrogated *ab initio*. See *Vincent v. Palmer,* 179 Md. 365, 19 A. 2d 183 (1941). See also 5A Corbin, *Contracts,* § 1236.

In the second place, when Duvall wrote his letter of May 16, 1960 calling for a return to a *status quo* position, he did not intend to call for a rescission of the contract, or to "elect" to have recovery by way of rescission in the strict legal sense of that word. See 5 Williston, *Contracts* (Revised Edition) § 1454A, page 4063. 1 Black, *Rescission and Cancellation,* § 6, pages 8-9. He was not advised by counsel at that time and it is unlikely that he had any knowledge of what would be entailed in a rescission of the contract. See 5A, Corbin, *Contracts,* § 1237, page 548. He explained what he meant by the term by stating that it meant "that any and all equipment ordered from you prior to your policy and warranty change, be returned to the factory (at your expense) and any notes or charges incurred by me be cancelled, and that my payments be returned and expenses incurred by me be reimbursed. Naturally, your warranty on the equipment I sold under pre-existing contracts will continue in full force and effect as originally made by you." He obviously did not intend to give up his claim for damages resulting from the breach. This is confirmed by the letter of August 8, 1961 to Republic demanding various items of damages totalling $110,153.83. Duvall's testimony indicated that he could not sell and install the equipment on hand under the new warranty. His proposition to be returned to the *"status quo"* in regard to the equipment on hand was an offer to mitigate the damages as to that equipment as, otherwise, there could well be a more substantial loss to Mathes if the equipment were retained and sold at distress prices, than if it were returned to Mathes.

The distinction between rescission and an attempt to mitigate damages is carefully discussed by Professor Corbin in 5A Corbin, *Contracts,* § 1237, pages 545-554. He states:

"Without doubt a considerable amount of injustice has been done by reason of variation and confusion in

the use of the term 'rescission.' When one party repudiates the contract or otherwise commits a very material breach, this fact may in itself discharge the other party from further duty under the contract. This is not a 'rescission' or even an offer of a rescission; yet it is often said that such a breach privileges the other party to 'rescind' the contract. This usage has caused serious difficulty; it should not be hopeless to try to eliminate it.

"Again, it is often said that the injured party may 'elect to rescind,' but that by such an 'election' he deprives himself of the right to compensatory damages for the breach. This is explained on the theory that 'rescission' is inconsistent with 'enforcement.' It is true that an agreement to rescind is inconsistent with the enforcement of that which is rescinded; but an agreement to rescind can be restricted by the parties in any way that they see fit; and it should never prevent the enforcement of any rights and duties they did not intend to discharge.

"A mere expression by the injured party of recognition of the fact that a vital breach has occurred and an assertion of his own discharge thereby is no part of an 'agreement to rescind'; it is not an offer to rescind, nor is it the acceptance of such an offer. Furthermore, it is not an 'election' between remedies, the very existence and character of which he cannot know until advised by a competent lawyer.

"When the injured party asserts his own freedom from the duty to perform further, he is merely trying to avoid further loss from the other's wrong—something that the law often requires of him whether he is willing or not. There are other methods by which he may reasonably endeavor to avoid or reduce injury; he may contract for some substitute material or service; he may ask the repudiator to repent and retract; he may demand replacement or the repair of defects; he may ask compensation for what he has done; he *may demand his money back or reconveyance of the*

*property;* and he may demand compensatory damages. In doing these things, he is trying to avoid harms and losses; he is not offering a 'rescission' or 'waiving' his rights or 'electing' a remedy. There also are things that the injured party can do; but they are clearly distinguishable." (Emphasis supplied).

In the third place, there was, in any event, in 1960 no *mutual agreement* to rescind the contract. A contract may be rescinded by the mutual consent of both parties, and this is the usual way in which rescission is accomplished. See *Loughran v. Ramsburg,* 174 Md. 181, 186, 197 Atl. 804 (1938). Cf. *Grauel v. Rohe,* 185 Md. 121, 131, 43 A. 2d 201 (1945). See also 1 Black, *Rescission and Cancellation,* § 1. Mathes temporized in regard to Duvall's letter of May 16, 1960 and never did give him a clear-cut answer in 1960.

Even if the equipment had actually been returned by Duvall and received back by Mathes shortly after May 16, 1960, it would still have been a question of fact for the trial court as to whether this amounted to a rescission in the correct legal sense of that word. *Abdallah, Inc. v. Martin,* 242 Minn. 416, 65 N. W. 2d 641 (1954).

Ordinarily, the measure of damages for this equipment would have been the difference between its value at the time of breach with the old warranty and its value with the new warranty, (Cf. *International Motor Co. v. Oldfield,* 134 Md. 207, 106 Atl. 611 (1919)), but this rule of damages is not applicable in this case because Republic, prior to trial, did accept the return of the equipment as offered by Duvall to mitigate the damages. This action then required a return of the consideration given by Duvall for the equipment thus returned by Duvall and received by Republic.

The action by Duvall in his letter of May 16, 1960 was to terminate the contract for a material breach of contract by Mathes and was not a termination under the 30 day clause of the contract.[1] The damages flowing from that breach were

---

1. Even if Duvall had terminated the contract under the 30 day provision, this would not have prevented him from recovering damages resulting from Mathes' breach prior to such termination. See Stern and Company v. International Harvester Co., 148 Conn. 527, 172 A. 2d 614 (1961).

fixed at that time, subject to Duvall's offer of mitigation of the damages as to the equipment on hand, which offer was belatedly accepted by Republic on July 24, 1962, when it took back the equipment before trial. As will be later pointed out, the trial court did err in the calculation of the damages by failing to give Republic credit for the balance due on the principal of the notes given by Duvall to Mathes and assigned to Republic.

## B.

We now come to a consideration of the various claims for damages involved in the case.

## 1.

We will consider first the damage claim for labor allowances for in-warranty repairs.

Duvall claimed $2,890.48 for the labor allowances. This total was made up of 86 separate invoices, two of which—Invoices Nos. 158 and 160 for $57.80 and $158.28, respectively, were for an incorrect sales discount and for freight and labor charges. Duvall testified that the majority of the items (all except 6 items) were covered by the provisions of paragraph 3C of the Bulletin of July 1, 1958 and six items were covered by the provisions of paragraph 3 of the Bulletin of June 1, 1958.

As to this item, the trial court stated:

"Concerning the claim of labor allowance for 'in-warranty' repairs, there is not sufficient proof that the repairs were all due to defective equipment or that they came within the warranty, so that all should be paid by Mathes rather than billed to the customers by Duvall (Plaintiff's Exhibit Nos. 132 and 133). However, because of the practice that has developed between the parties and the abrupt change in policy by the defendant, the Court feels that plaintiff is entitled to recover one-half of the amount claimed, or $1,445.00."

Our examination of the items involved and the testimony leads us to conclude that although possibly certain items were properly deductible, the deduction of 50% by the trial court of the amount claimed by Duvall was larger than was justified, but because there is no cross appeal by Duvall and the ruling

was more favorable to the appellants than justified by the evidence, we will not disturb this allowance to Duvall by the trial court.

## 2.

Next, we consider the damage claim for unpaid amounts for in-warranty parts returned by Duvall to Mathes.

Duvall claimed $13,079.63 for these unpaid amounts. This total is made up of 50 separate items, of which 31 were compressors. Duvall admitted that this portion of his claim was carried at the full listed price, but that he had purchased the items at a 40% discount.

The trial court found as to those items:

"Plaintiff claims, on open account, for returned parts not credited (Plaintiff's Exhibit No. 41). Since according to the evidence approximately one-half of the parts returned were not his installation, and since he had been acting in the capacity of a factory service man, by a practice between the parties, the Court feels that he has sufficiently proven part of his claim. The Mathes Company had been relying on his judgment and had been giving him credits similar to those in transactions herein claimed. Parts were purchased at a 40% discount. Therefore, deducting said 40% of the cost and an additional 10% for denials and discrepancies, the Court will allow 50% of the amount claimed, or $6,540.00"

In our opinion, the trial court's findings that Duvall had been acting as a factory service man for Mathes; that Mathes had relied upon his judgment; and, that Mathes had given Duvall credit in similar transactions are all supported by the evidence. So far as the allowance of claims for the unpaid amounts for these in-warranty parts is concerned it makes no difference whether or not the parts were from Duvall's own installation or from those made by other dealers. It was, of course, proper for the trial court to deduct 40% of the list price to reflect the amount actually paid by Duvall for the parts. The deduction of an additional 10% "for denials and discrepancies" is of doubtful validity as there does not appear to be any evidence to support this percentage of deduction, but as it is more favorable to

the appellants than they were entitled to, here again we will not disturb the trial court's allowage of approximately 50% of the amount claimed, or a net of $6,540.00.

We might add that the appellants complain that there is no evidence to establish that the returned parts were defective or that the claimed labor allowances were in connection with defective parts. As we have already indicated, the trial court properly admitted into evidence the Return Parts Tags and the Material Return Tag Tally Sheets as records kept in the ordinary course of business and on forms issued by Mathes. The nature of the defect placed on these forms, together with the testimony of Duvall and Sutton and the prior business practice between Duvall and Mathes were sufficient, in our opinion, to support the trial court's findings.

### 3.

The remaining claims for damages for which allowance was made by the lower court may be considered together as they arise out of the return of equipment by Duvall and its acceptance by Republic on July 24, 1962.

Duvall had claimed $2,430.00 for rent on the warehouse in which the equipment was stored from January 25, 1960 to the time suit was filed; interest and insurance charges on the warehouse equipment of $2,083.12; the 20% down payment on equipment of $4,287.13; and, the bonded warehouseman's salary of $4,427.95. He also claimed $79,965.00 consisting of seven items making up the value of the unexpired 5 year warranty on various equipment.

The trial court allowed $3000.00 as rent on the warehouse for 30 weeks at $100 a week, disallowed the interest and insurance charges of $2,083.12, allowed the 20% down payment of $4,287.13, disallowed the bonded warehouseman's salary of $4,427.95 and disallowed the value of the unexpired 5 year warranty of $79,965.00. He did allow as additional credit allowed on return equipment of $12,321.04. In reaching this last figure, the trial court accepted as the value of the returned equipment, the inventory value of $23,260.17 instead of the value of $11,911.20 which Republic had placed upon the returned equipment and had given credit for that amount against

the note account. Republic had made no public or private sale of the returned equipment and the trial court rejected the testimony by which Republic sought to establish the $11,911.20 valuation. We cannot say that the determination of value for the returned equipment by the trial court was clearly erroneous so that his finding in this regard will be accepted. From this figure of $23,260.17, however, the trial court deducted the $4,287.13 for which allowance had already been made and also deducted $4,652.00, approximately 20% of the $23,260.17 as an allowance for depreciation and obsolescence. This resulted in a net balance of $14,321.04.

We are of the opinion that the trial court properly disallowed the interest and insurance charges of $2,083.12 on the ground that the items making up this total had not been sufficiently proved.

The disallowance of the claim for warehouseman's salary of $4,427.95 was correct. The warehouseman was Duvall's secretary, the principal part of whose salary was paid by the St. Louis office of Maco. The secretary testified that there was little work for her to do on the Mathes-Duvall account during 1960, 1961, 1962 and 1963.

The trial court also correctly disallowed the $79,965.00 as the alleged value of the unexpired 5 year warranty on various equipment, as the proof of the items making up the portion of the claim was too speculative, and was also inconsistent with Duvall's offer to mitigate the damages. In any event these disallowances will not be disturbed by us as there was no cross-appeal filed by Duvall.

The allowance of the 20% down payment on equipment of $4,287.13 should be reflected in the allowance of the value of the equipment returned and not separately allowed and then deducted from such an allowance as was done by the trial court, although the financial result is the same in either case.

The trial court accepted as correct Duvall's account (defendant's exhibit 14A) showing that the Mathes open account had been fully paid and a credit balance of $70.51 existed in the open account as of August 31, 1960. We cannot say that the trial court's rejection of the Mathes alleged balance in this open account of $1,682.32, plus interest, was clearly erroneous.

We are of the opinion that the trial court erred in making this calculation of damages as the lower court failed to give credit to Republic for the balance due on Duvall's notes and made the 20% deduction for depreciation and obsolescence, for which percentage there was no sufficient support in the evidence.

As we have already mentioned, the usual measure of damages is not applicable in connection with the equipment in the warehouse as Duvall made the offer to return it in mitigation of the damages and Republic finally did accept the return of that equipment. When this was done Duvall was entitled to credit for the value of the equipment and the cost of storing it from the time of breach on January 25, 1960 until the time of removal on July 24, 1962, a 30 month period, while Republic was entitled to a credit for the unpaid balance of the notes given by Duvall for the equipment but not paid by him. See *International Harvester Co. v. Neuhauser Co.*, 128 Md. 173, 97 Atl. 372 (1916). As Duvall's allowable claims exceeded the balance due on the notes, interest on the notes should not be allowed, and the attorneys' fees for collection mentioned in the notes should likewise not be allowed. The attorney's fee of 6% provided in the notes is only payable upon the "unpaid principal and interest then owing," i.e., when the "note is not paid according to its terms and is placed in the hands of any attorney for collection." When nothing is payable upon the notes as a result of a proper credit, tender or defense, the attorney's fee is not collectible even if the notes were placed in the hands of an attorney for collection and an action to collect the notes was filed. See *Pioneer Constructors v. Symes*, 77 Ariz. 107, 267 P. 2d 740 (1954). The rule is stated by the Supreme Court of Arizona as follows:

> "The general rule is: Where reasonable attorney fees or some designated percentage is provided for in the note, and defendant counterclaims and recovers on the counterclaim, the plaintiff recovering on the note, the amount recoverable for attorney's fees is reduced in proportion to the amount recovered on the note less the amount recovered on the counterclaim [citing several cases]. It follows that in such instance the attor-

ney's fees may be reduced to a point where nothing is recoverable as attorney's fees, and such is the situation in this case." (Page 744 of 267 P. 2d).

To the same effect see *Morgan v. Virginia-Carolina Chemical Co.,* 213 Ala. 551, 106 So. 136 (1925). See also *Collingsworth v. King,* 283 S. W. 2d 30 (1955, S. Ct. of Tex.) ; *Grace v. Dunn,* 171 Okla. 85, 42 P. 2d 131 (1935) ; and, *Bongiovanni v. Fickett,* 122 Cal. App. 538, 10 P. 2d 539 (1932).

We are of the opinion that the trial court was correct in allowing Republic a credit for the costs involved in the repossession of the equipment wrongfully attached by Duvall and paid for by Republic. See *Rhodes Hardwood Flooring Co. v. Blue Ridge Flooring Co.,* 225 Md. 158, 169 A. 2d 399 (1961). These consisted of sheriff's fees of $1,427.40, freight charges of $1,219.00, reconditioning charges of $335.33, labor costs of $226.80 and supervisory charges of $218.94, a total of $3,427.47.

In our opinion, the proper calculation of the damages in connection with the return of the equipment should be as follows:

| | | |
|---|---|---|
| Credit to Duvall : | | |
| Value of Returned Equipment | | $23,260.17 |
| Rent for 30 months at $100 a month | | 3,000.00 |
| | | $26,260.17 |
| Credit to Republic : | | |
| Balance due by Duvall on principal of notes | $10,099.55 | |
| Costs of repossession | $3,427.47 | |
| | | $13,527.02 |
| Net Credit to Duvall | | $12,638.68 |

The amount of the judgment which the trial court should have entered on April 24, 1964 in favor of Duvall and against Glen Alden and Republic should have been $20,623.68 instead of $27,735.00, an excess of $7,111.32. The correct figure of $20,-623.68 is made up of the following:

| | |
|---|---|
| Unpaid claim for labor allowance | $ 1,445.00 |
| Unpaid amounts of returned in-warranty parts | 6,540.00 |
| Net credit to Duvall on return of equipment | 12,638.68 |
| Correct amount of judgment | $20,623.68 |

438

Interest on this correct amount should run at 6% per annum from April 24, 1964.

> *Judgment entered on April 24, 1964 in the amount of $27,-735.00 is modified by reducing it by $7,111.32 to $20,-623.68, with interest to run upon $20,623.68 at 6% per annum from April 24, 1964 and as modified said judgment is affirmed; the appellants to pay three-fourths of the costs and the appellee to pay the remaining one-fourth of the costs.*