ADLER, ET AL. *v.* WALKER & DUNLOP, INC.

[No. 45, September Term, 1966.]

154

*Decided January 9, 1967.*

The cause was submitted on the brief to HAMMOND, C. J., and HORNEY, MARBURY, BARNES and FINAN, JJ.

Submitted by *John J. Ghingher, Jr.* and *Weinberg & Green* for appellants.

Submitted by *Joseph I. Huesman* and *Lerch & Huesman* for appellee.

HORNEY, J., delivered the opinion of the Court.

In this case, concerning the construction of a shopping center that was never undertaken and the making of a construction loan that was never consummated, the questions on appeal are (i) whether or not the finding of the lower court that the mortgage broker had not been paid its commission was erroneous and (ii) whether or not the individual property owners were

personally liable for the brokerage commission and the title examination expenses sued for.[1]

The owners of the property, Bettye S. Adler and Earl B. Missler, and the proposed transferee, Beltway Plaza Shopping Center, Inc., were the defendants below and are the appellants here. The mortgage broker, Walker & Dunlop, Inc., was the plaintiff below and is the appellee here.

The individual appellants, who are the fee simple owners of a thirteen-acre tract of land in Anne Arundel County, planned to construct a shopping center thereon. With this in mind, the property owners formed the corporation in which they (and their mother) were to be the only stockholders and to which they intended to transfer the land. Although franchise and personal property tax returns were filed for three years, the land was never transferred to the corporation. Nor were any shares of stock ever issued by it. And the corporation never had a bank account. Leases were executed with prospective tenants during the formative years of the venture. Some were executed by the corporation. Some bore the name of the corporation over the signature of Earl B. Missler. But other leases were executed by the property owners only.

In 1960 and 1961, a vice president (H. Evan Smith) of the mortgage broker, a real estate broker (Lionell Olesker) engaged to obtain leases for the shopping center and one of the property owners (Earl B. Missler) had several discussions with respect to financing the construction of the project. By a letter dated February 6, 1962, Missler authorized the broker to negotiate a loan for $670,000 and therein agreed to pay the broker "a loan placement fee in the amount of 1% of the loan applied for or accepted." The authorization which was limited to a period of sixty days was later extended by agreement to April 19, 1962.

Within the extended time, the broker communicated with the Lincoln National Life Insurance Company and it agreed to loan the shopping center corporation $670,000 by its commitment let-

---

1. While a motion for summary judgment was filed by the defendants, it was agreed that the court instead of ruling thereon should take testimony and decide the controversy without the aid of a jury.

ter of April 19, 1962, addressed to the corporation, "c/o Walker & Dunlop, Inc." When the broker informed Missler by letter on May 1, 1962, that his application for a loan had been approved, he accepted the commitment "without exception" on the same day. Among the stipulated terms and conditions, one specified that the "loan commission" should be one percent of the amount of the construction loan.

Prior thereto, on March 15, 1962, a check drawn on the Baltimore National Bank, payable to the order of "Walker & Dunlop" in the sum of $6700, was signed by Earl B. Missler. A notation thereon—"1% for comm. on shopping center" — was written in ink in the lower left corner of the check. The check was deposited by the broker in its trustee account and, on May 2, 1962, the broker sent its check in the same amount to the prospective mortgagee in payment of the good-faith deposit or commitment fee (reduced from $13,400 to $6,700) requested by it in its commitment letter of April 19, 1962.

About a month later the broker made application to the Title Guarantee Company for a title policy, as it was authorized to do under the terms of the original authorization given the broker by the property owners. In due time a report that the title was insurable was received by the broker.

Somtime thereafter, when it became evident that the property owners were confronted with increasing costs of construction and other problems, the broker wrote Missler a letter on May 28, 1963 advising the owners that the loan commitment would expire on June 1, 1963 and explaining that the insurance company would not guarantee a loan after that date because the construction of the project was uncertain. In the letter the owners were advised that should they make a "new proposal," the broker would "try to salvage" whatever part it could of the commitment fee then held by the insurance company. At the same time, the broker reminded the owners that its commission (loan placement fee) was still unpaid and that it expected them to honor both the oral and written agreements as to the payment thereof.

In addition to the documentary evidence, there was testimony to the effect that Missler understood that the check for $6700 dated March 15, 1962 was for the good-faith deposit or com-

mitment fee the insurance company required; that he had full knowledge of the use to which the check was put; and that such use was in accordance with the understanding between the property owners and the broker. There was also uncontradicted testimony to the effect that prior to June 1, 1963, Missler asked the broker to revive the loan commitment and to have the fee applied to the loan. Furthermore, Missler not only admitted receiving the letter of May 28, 1963, referring to both the commitment fee and unpaid brokerage commission, but he introduced no evidence to either controvert or modify the obvious import of that letter. Payment not having been made this suit was brought to recover the commission of $6700 as well as the unpaid title expenses of $1322.50.

The lower court found that "1% comm." referred to the *commitment fee* paid to the insurance company and not the *brokerage commission* due the mortgage broker; that the corporation was the agent of the property owners; and that they, as well as the corporation, were liable to the broker for the unpaid commission and title expenses. Accordingly, the court entered a judgment in favor of the broker in the sum of $8022.50 against all of the defendants-appellants.

The appellants, claiming that the $6700 check was intended to pay the commission due the broker and not the commitment fee; that the corporation, not the property owners, is liable for the commission and title expenses; that the broker, having dealt with the property owners as a corporation, is estopped from denying the existence of the corporation; and that there was a novation whereby the corporation assumed whatever obligations the property owners may have incurred in connection with the prospective loan, contend that the lower court was in error in finding for the plaintiff-appellee. The appellee, claiming that the action of the lower court in finding as it did was not erroneous, contends that the property owners are personally liable for the amount claimed since the corporation was in reality acting as an agent of the property owners, and denies that a novation took place.

Since, in our review of the evidence under Maryland Rule 886 (a), we find nothing in the record to indicate that the finding of the trial court was erroneous, the judgment of the trial

court will be affirmed. Not only did the documentary evidence on the whole justify the finding that "comm." was an abbreviation of "commitment" rather than "commission," but there was ample evidence—particularly the fact that at least three of the leases were executed by the property owners individually and the further fact that a fourth one purportedly executed by the corporation was thereafter ratified by the property owners— that the individual appellants were personally liable for the commission due the appellee.

Nor can we say that it was error for the court to infer that there was an agency relationship between the corporation as agent and the property owners as principals. Besides the undisputed fact that the corporation was a body corporate in name only in that no shares of stock were ever issued and the corporation had no bank account, there were other facts indicating that the corporation was created for the sole purpose of having it eventually take title to the land and develop it as a shopping center for the property owners but that there was no intention of transferring title to the corporation until the development of the project was assured. That a corporation can be an agent for an individual and that an agency may be inferred from the surrounding circumstances was established in *White v. Friel,* 210 Md. 274, 123 A. 2d 303 (1956). And whether or not an agency exists is a question for the trier of facts to decide. *Heslop v. Dieudonne,* 209 Md. 201, 120 A. 2d 669 (1956) ; *White v. Friel, supra; Steele v. Seth,* 211 Md. 323, 127 A. 2d 388 (1956).

Lastly, there is no basis for the claim that there had been a novation whereby liability under the agreement to pay a commission was to fall only on the corporation. For a novation to exist there must be an agreement among the parties to extinguish the old obligation and substitute a new one for it. *District National Bank of Washington v. Mordecai,* 133 Md. 419, 105 Atl. 586 (1919) ; *Hudson v. Maryland State Housing Co.,* 207 Md. 320, 114 A. 2d 421 (1955). Since there is nothing in the record showing that the broker agreed to nullify the obligation of the property owners to pay the commission and title expenses and look only to the corporation for the payment of

the sums due the broker, a novation cannot be presumed or implied.

*Judgment affirmed; appellants to pay the costs.*