LEISNER *v.* FINNERTY, ET AL.

[No. 125, September Term, 1968.]

*Decided March 6, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, McWILLIAMS, FINAN and SINGLEY, JJ.

*Clater W. Smith, Jr.,* with whom was *H. Reese Shoemaker,
Jr.,* on the brief, for appellant.

*Leon B. Pennington* for appellees.

FINAN, J., delivered the opinion of the Court.

These proceedings were instituted by Virginia A. Finnerty
and her husband (appellees) against Victor A. Leisner (appel-
lant), a nephew of Mrs. Finnerty, for expenses and profit aris-
ing out of a contract between the parties. Mr. Finnerty died
while the claim was pending and the administrator of his estate
was named as his successor in interest.

At the time of the happening of events and exchange of cor-
respondence here involved, the Finnertys, former residents of
the Emmitsburg-Thurmont area of Maryland, were living in

semi-retirement in Florida and the appellant was living in Thurmont, where he was engaged in the real estate business. The appellant and the Finnertys communicated frequently and were on friendly terms. The Finnertys had accumulated a small estate and there apparently had been some discussion between the parties regarding the investment of part of the Finnertys' savings in real estate.

On July 5, 1961, the appellant wrote the Finnertys urging them to buy a property in Pennsylvania known as Blossom Inn. The appellant advised them that the Inn was in a good state of repairs and had good possibilities. He suggested that it could be operated as a nursing home or it could be resold at a profit after holding it for a short period of time. He further stated: "I don't want to get your hopes up too high and I don't want to say you'll make a million but I will say that you will make many times the money from it you would leaving it in a credit union. I will personally see to that, no matter what way you look at it you can't lose."

In September, 1961, the Inn was purchased for $26,500.00. Title was taken in Leisner's name who executed a $16,000.00 mortgage in favor of the Thurmont Bank, and then deeded the property to the Finnertys who paid the balance of $10,500.00.

During 1962, the Finnertys as sole owners contributed to the maintenance of the property by paying insurance, electricity, taxes and interest on the mortgage. On September 25, 1962, Mrs. Finnerty sent the appellant an itemized statement as to her investment in the property which contained $2,931.32 as total expenses as of that date. In January, 1963, the Finnertys were in need of money and Mrs. Finnerty wrote the appellant to that effect. At the trial Mrs. Finnerty testified that she wrote to her nephew "Because I needed money and also at that time all I asked for, I asked for him to bail me out so to speak, and at that time I asked for only the expense I had in it." As a result of that letter appellant paid the Finnertys $5,250.00, which was one-half of their principal investment, and in return acquired a half interest in the Inn. The appellant then assumed responsibility for payment of all expenses on the property. In December 1963, Mrs. Finnerty wrote the appellant stating that she hoped he would buy her out or dispose of Blossom Inn by

the early part of 1964. She added that she thought that if he were to become sole owner, he could do with it what he wished without consulting her. In the same letter she reminded the appellant of his statement in his letter of July 5, 1961, in which he assured the Finnertys "that no matter what way you look at it you can't lose," and she expressed her desire to break even by recouping the money invested, as well as money representing lost interest on the invested sum.

In a letter dated November 21, 1965, the appellant told the Finnertys that the property was tied up in a zoning appeal and that he would be unable to do anything with it that year and that he thought he would have to pay several thousand dollars to repair damage done to the Inn by chipmunks and a leaking roof. Thus he proposed:

> "I think under the circumstances the best thing I can do is to pay you the money you have in the place and take over and dispose of it. If after I take over and sell it and make any profit at all I will split the profit with you. If I sell it at a loss, I will take the loss myself. I am very sorry that this particular investment hasn't turned out as yet and it is dragging too long. The Thurmont Bank has been after me to pay off the mortgage as the Bank examiners have been on their back because only interest has been paid since we took out the mortgage. I told them that I couldn't pay them at this time because of the arrangement we have. They are getting a little insistent now so I will have to do something.
>
> "If this arrangement meets with your approval please let me know the cash amount you still have in Blossom Inn and I will take care of the paper work up here. But if you want to continue to ride this thing out it's OK with me. I just told you I would like to clear this up this year and this is the only way I know how."

The letter was in appellant's handwriting and sometime after it was received, Mrs. Finnerty made the following notation on the top of the first page: "ans'd via phone Yes for $5,250 also

letter 11/30/65." The letter of November 30, 1965, could not be located and hence was not available as an exhibit. In the early part of December 1965, the appellant went to Florida and gave the Finnertys a check for $5,250.00 whereupon the property was deeded to him in his sole name. Subsequently appellant sold the property.

The Finnertys then brought suit for incidental expenses they incurred in purchasing Blossom Inn and in holding the property, and also claimed a share of the profit realized by appellant when he subsequently resold the property. The Finnertys claimed that appellant had induced them to invest in the Blossom Inn and had agreed to insure them against loss, and that if the appellant made a profit on the sale of the Inn, he should share the profit with them. The appellant contended that there was an agreement entered into before the property was deeded to him as the sole owner which resulted in a novation and that under the terms of the novation he was not obliged to pay the loss of interest and expenses claimed by the Finnertys.

The case was tried before the lower court sitting without a jury which held that there was a lack of proof of any profits from the sale of the property and found against the Finnertys on that point. However, the court did render judgment in favor of Mrs. Finnerty and the administrator of her husband's estate for expenses and losses incurred in the amount of $2,694.89.[1] The trial court discounted the novation theory, holding there was never a *concursus ad idem,* which would be necessary to support the creation of a new contract between the Finnertys and the appellant, whereby the old one would be extinguished.

We are therefore presented with this question: was there a subsequent agreement between the Finnertys and appellant which amounted to a novation thereby relieving the appellant from any obligation to pay the expenses incurred by the Finnertys in this misadventure.

Counsel for both parties in their brief and the lower court in its opinion focus their attention on the operation of the occur-

---

1. Losses consisted of: interest $960.00; electricity $21.21; insurance $256.30; taxes $366.45; capital gains taxes on securities sold $240.00; loss of interest on securities $420.00, and closing costs $430.93.

rence or non-occurrence of a novation. It therefore behooves us to devote some discussion to the meaning of a "novation," a term which has been explained by this Court on previous occasions. Although the *Restatement, Contracts,* Section 424, would require that a new party be introduced into the existing agreement in order for a "novation" to occur, the decisions in this State and many other jurisdictions have made no such distinction or requirement. Although the position taken by the *Restatement,* may be the more proper one from a puristic standpoint, we find that in Maryland and elsewhere the terms "novation," "merger," "accord" and "substituted contract" have at times been used interchangeably. We think this Court both recognized and answered this problem in semantics when Chief Judge Brune for the Court in *Hudson v. Md. State Housing Co.,* 207 Md. 320, 114 A. 2d 421 (1955), with his usual perspicuity stated:

> "In current legal terminology some authorities apply the term 'merger' or 'substituted contract' rather than 'novation' to the substitution of a new agreement for an old one between the same parties, and reserve the term 'novation' for a new agreement in which one or more new parties are introduced. *Restatement, Contracts, Sections* 424, 443; *Williston, Contracts,* Rev. Ed., Section 1865. The latter points out, however, that the term 'novation' is not uncommonly applied in the common law, as well as in the civil law, to a substituted contract between the same parties. In this State the term 'novation' has been applied to a new contract between the parties as well as to a new contract involving one or more new parties. In *Baltimore Academy of the Visitation v. Schapiro,* 169 Md. 332, 181 A. 731, it is stated that 'A novation may occur by a change of parties to the contract, by the change of the subject matter, by the change of the terms and conditions.' Likewise, in *District National Bank of Wash. v. Mordecai,* 133 Md. 419, 105 A. 586, this Court said: 'A novation may be made by the substitution of a new obligation or contract between the same parties, with the intent to extinguish the old obligation or contract,

but it does not result from the substitution of one paper writing for another, or one evidence of debt for another, or one contract for another, unless such substitution is made with the intention of all parties concerned to extinguish the old one.' " *Id.* at 326-327.

See also, *Williston, Contracts,* 3d Ed., Vol. 2, Section 353; *Corbin, Contracts,* Vol. 6, Section 1293; *Brantly, Contracts,* 2d Ed., Section 175.

The necessary elements of a novation were set forth in *District National Bank of Washington v. Mordecai,* 133 Md. 419, 105 A. 586 (1919), wherein this Court stated:

"A novation is a new contractual relation and contains four essential requisites: (1) A previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution for it of the new one. * * *." *Id.* at 427.

The above enumerated requisites are also repeated in *Williston, Contracts,* 3d Ed., Vol. 2, Section 353.

In reviewing the record in the case at bar we find the requisites essential to a novation to be present.

The parties raised no doubt concerning the validity of the original agreement between them, whereby in return for the Finnertys' purchasing Blossom Inn, Leisner agreed to save them harmless from loss. The venture unfortunately did become a hapless one. A year after the property had been acquired, Mrs. Finnerty notified Leisner of her expenses to that date, which were almost $3,000.00. Approximately 18 months later, in January of 1963, the Finnertys notified the nephew, Leisner, that they needed money and wanted to be "bailed out." Leisner responded by purchasing an undivided one-half interest in the Inn for $5,250.00. Approximately a year later Mrs. Finnerty urged Leisner to become the sole owner of the Inn, or else they could dispose of it to a third party. There is no doubt that there had been at this time a change in the position of the parties as the circumstances were such that they no longer expected to profitably operate the Inn. Zoning problems had also affected the

prospects of an immediate profitable resale. The bank was also pushing for the liquidation of the principal amount of the mortgage.

We think the proposal for a substituted contract, or novation, is contained in Leisner's letter of November 21, 1965, which is previously set forth in this opinion, whereby he offered the Finnertys "to pay you the money you have in the place and take over and dispose of it." He further offered to share any profit made from the sale of the property and to personally sustain any loss. He also presented the alternative that, on the other hand, if they so chose they could "continue to ride this thing out." The Finnertys with full knowledge of the surrounding circumstances and the proposal before them, made the election to sell their remaining undivided one-half interest in the property for $5,250.00. This in our opinion was a novation.

We believe that the circumstances surrounding the original contract and the relationship between the parties had become so altered, that by accepting Leisner's offer in the letter of November 21, 1965, the parties mutually agreed to a new contract, in lieu of their previous agreement. We think they intended to extinguish the original agreement and to be bound by the terms of the new proposal.

It should be borne in mind that there does not have to be an expressed intention to substitute the new agreement for the previous contract. "Facts and circumstances surrounding the transaction and a subsequent conduct of the parties may show acceptance as clearly as an express agreement. These facts and circumstances must be such that the intention to work a novation be clearly implied." *Williston, Contracts,* 3d Ed., Vol. 2, Section 353 at 816. (Williston cites *Huron v. Fuller,* 52 F. 2d 870.) See also, *Swift v. Allan,* 211 Md. 588, 128 A.2d 260 (1957), and *Cole, Adm'x v. Wilbanks,* 226 Md. 34, 171 A. 2d 711 (1961).

The Finnertys raised the question in the court below that the novation was unenforceable, because it did not comply with the Statute of Frauds which requires a written memorandum as evidence of an agreement to sell land. This point was not reached by the trial court, however, it does not give us concern, for the simple reason that the Statute of Frauds applies

only to executory contracts and not to those which have been performed by the parties. *Whiteley v. Schoenlein,* 183 Md. 590, 596, 39 A. 2d 692 (1944).

The Finnertys actually attempted to enforce the novation in the sense that one of their two claims was for a share in the profits that Finnerty allegedly had realized from the sale of Blossom Inn. The lower court found that there was no proof whatsoever with regard to any profit arising from the sale.

Although we have sympathy for the plight of the aged aunt and uncle who entrusted a substantial portion of their savings to their nephew in the hopes of obtaining a return materially greater than the normal yield from interest on a savings account; yet, the facts leave no doubt in our minds that the requirements under the law for a novation have been met. In fairness to the nephew, although it has nothing to do with the determination as to the novation, he apparently did the best he could to restore his aunt and uncle to their former financial condition. The expenses incurred by the Finnertys could only be recovered under the original contract and that was extinguished by the substituted agreement.

*Judgment reversed, appellees to pay costs.*