# TWINING v. NATIONAL MORTGAGE CORPORATION

[No. 221, September Term, 1972.]

*Decided April 4, 1973.*

550

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Peter R. Hartogensis,* with whom were *Wheeler, Korpeck & Nadonley* on the brief, for appellant.

*Lance W. Billingsley* for appellee.

SMITH, J., delivered the opinion of the Court.

Appellant Erlyne Twining (Mrs. Twining) here seeks reversal of a judgment for $125,000 entered against her in favor of appellee National Mortgage Corporation (National Mortgage) based upon a contract for extension of the due date of an indebtedness guaranteed by her. Since the matter was heard without a jury Maryland Rule 886 is applicable.

Mrs. Twining held one-third of the stock in a corporation which owned a tract of land in Prince George's County which it hoped to develop profitably. A first lien on the land was held by the sellers to that corporation. A payment was due in December, 1970. A second lien was held by National Mortgage. Mrs. Twining and her associates had personally guaranteed payment to National Mortgage.

Mrs. Twining and her associates went to National Mortgage and advised that the December, 1970, payment on the first lien could not be paid. The associates elected to forfeit, if necessary, the amount they had invested, but Mrs. Twining proceeded to negotiate with National Mortgage. It agreed to buy the first lien and to extend the due date of the first and second liens to June 30, 1971, in return for the payment of $125,000 by Mrs. Twining. It

was said that the negotiations in process with a subsidiary of a nationally known developer for development of the land were such that Mrs. Twining believed that by March of 1971 she would have a deal that would pay off the liens and leave her with a profit of $500,000. The June 30 date was agreed upon as a precautionary measure. In accordance with this then oral agreement the first lien was acquired by National Mortgage on December 23, 1970.

Negotiations between the parties continued. A change was made in the proposed developer of the tract. A proposed form of contract was prepared by counsel for National Mortgage. The original developer was replaced by a group with which Mrs. Twining's then attorney was involved. The contract was revised by counsel for Mrs. Twining. Apparently, after he prepared it and had his client execute it, further discussions took place between him and one of the officers of National Mortgage because in forwarding the contract to the secretary of National Mortgage the attorney said:

> "Unfortunately Mrs. Twining came to my office and left before I was able to get back to make the necessary changes. However, I do not anticipate she will have any objection thereto and would suggest that National Mortgage execute the documents and initial the changes, as presently drawn. I feel certain that Mrs. Twining will come by on Monday or Tuesday of next week to initial those changes made after she executed the document."

Mrs. Twining did indeed initial the changes and immediately thereafter the contract was executed by National Mortgage, although apparently its officers failed at that time to initial those alterations in the typed instrument. It was then forwarded to counsel for National Mortgage who also was to sign it by virtue of a provision in it for escrow of an executed deed from the owner

of the land to which we shall later refer. He did execute and the contract was then returned to National Mortgage. It was on May 18 or May 19 that the changes in the contract—changes which were in the contract when it was forwarded by Mrs. Twining's attorney to National Mortgage and which were initialed by her prior to the execution by National Mortgage—were initialed by the appropriate officer of National Mortgage. It was then placed in the safe deposit box of National Mortgage. In the interim, counsel for Mrs. Twining wrote a letter to National Mortgage in which he said:

> "I am still awaiting an executed copy of the agreement reached between you and Erlyne Twining on the Willow Hills property. I would appreciate your advising me as to the status of this matter."

That letter was unanswered, apparently, so we were advised at oral argument, because the agreement was then resting upon the desk of National Mortgage's vacationing attorney.

The agreement was dated December 23, 1970, the date that National Mortgage acquired the first lien on the real estate. It recited that National Mortgage was the holder of three deed of trust notes secured by three deeds of trust on the property in question; that Mrs. Twining had guaranteed the payment of all; that the notes were in default, had been accelerated, continued to remain in default, and were the subject of pending foreclosure proceedings; and that Mrs. Twining was desirous of having the foreclosure proceedings abated.[1] National Mortgage agreed to abate all foreclosure proceedings by virtue of these defaults until June 30, 1971. Mrs. Twining was "given the absolute right to extend the term of [that] Agreement for six (6) months by sending written notice

---

1. The record furnishes no explanation for the reference here to three deeds of trust, while we have previously spoken (as do the briefs and record) of first and second liens, but not of a third lien.

to National Mortgage on or before June 30, 1971 stating her desire so to do." Paragraph 5 of the agreement read as follows:

> "5. Twining further agrees to pay to National Mortgage by no later than December 30, 1971, the sum of One Hundred Twenty-five Thousand Dollars ($125,000.00) which the parties acknowledge is the amount agreed upon to reimburse National Mortgage for its legal and other costs, any loss it may have been caused to suffer by virtue of abating the aforementioned foreclosure proceedings, and any loss caused to it by forebearing on the collection of principal and interest payments due and payable on the Deed of Trust Notes."

It is this provision upon which suit was based. The amended declaration omitted the common counts included in the original declaration and proceeded only upon a single special count.

On October 12, 1971, Mrs. Twining wrote a letter to National Mortgage referring to a photostatic copy of the December 23, 1970, agreement and advising "that the written offer to enter into the said agreement, as represented by the aforesaid document, [was] [t]hereby withdrawn." It is conceded that from December of 1970 until October 12, 1971, no payment was made on the notes and no demand made by National Mortgage. Mrs. Twining stated that she wrote the October 12 letter after she had obtained refinancing.

Three arguments are advanced by Mrs. Twining to avoid the judgment: (1) that the contract was void for lack of consideration and mutuality of obligation, (2) that the contract never came into existence (a) because of nonperformance of a condition precedent and (b) for lack of acceptance, and (3) that it "was an instrument under seal, and, therefore, lack of delivery prevented the contract from coming into existence."

It would appear that the forbearance relative to the debt was consideration, but the concession by Mrs. Twining that the contract was under seal, as it was, disposes of the point relative to lack of consideration. As Professor Brantly put it in *Law of Contract* (2d ed. rev. 1922) § 51:

> "The common law has never required a consideration in contracts under seal, but has enforced them because they were held to be the deliberate engagements of the parties making them."

To like effect and in greater detail *see* 1 A Corbin, *Contracts* § 252 (1963) and 1 Williston, *Contracts* § 109 (3d ed. Jaeger 1957), consistent with the comment of this Court in *Conowingo Land Co. v. McGaw*, 124 Md. 643, 652, 93 A. 222 (1915), "Inasmuch as the seal imports consideration it could not properly be said that there was no evidence legally sufficient to show any consideration . . . ." *See also Roth v. Baltimore Trust Co.*, 161 Md. 340, 349, 158 A. 32 (1931), and *Ingersoll v. Martin*, 58 Md. 67, 74, 42 Am. R. 322 (1882). Accordingly, this contention is without merit.

Mrs. Twining failed to develop her argument relative to lack of mutuality. We are of the opinion that this contention is likewise without merit.

In making her contention relative to nonperformance of a condition precedent Mrs. Twining has reference to the fact that under the contract at execution there was to be delivered a deed from the corporation in which Mrs. Twining was interested conveying to National Mortgage the land covered by the deeds of trust. It was to be held in escrow by counsel for National Mortgage until 10 days after National Mortgage might notify the attorney with copy to Mrs. Twining of her "failure to comply with any of the terms and conditions of [the] Agreement." The executed deed apparently remained in the possession of her attorney because its delivery was neither tendered nor requested.

This provision obviously was intended as a shield for the protection of National Mortgage and not as a sword for the use of Mrs. Twining against National Mortgage. It would be an odd rule of law that would permit Mrs. Twining to avoid liability here because National Mortgage failed to insist upon performance of a provision obviously meant for its protection. It may well be that the condition here was not strictly speaking a condition precedent. Be that as it may, it is elementary that either party to a contract may waive any of the provisions made for his benefit. *See Shoreham v. Randolph Hills*, 248 Md. 267, 274, 235 A. 2d 735 (1967), Brantly, *op. cit.* § 140 at 316-17, and 17 Am. Jur. 2d *Contracts* § 390 (1964) at 835. Thus, Mrs. Twining's contention upon this point is without merit.

The contentions of Mrs. Twining that the contract never came into existence for lack of acceptance and that it was an instrument under seal and therefore lack of delivery prevented it from coming into existence are related. We find persuasive the statement in 1 A Corbin, *op. cit.* § 244 where it is said:

> "A contract under seal or other sealed instrument does not become operative as such until the party executing it does some overt act indicating that he intends it to be immediately operative. This act is called 'delivery.' In the great majority of cases, delivery takes place by the obligor's putting the instrument into the possession of the obligee or of some third person as agent of the obligee. There are cases, however, in which it was held that an effective delivery had taken place in spite of the fact that the document had not come into the possession of the obligee or his agent. In all of them the obligor had done an act indicating an intention that the sealed instrument should be immediately effective.

"A leading case decided in the House of Lords supplies a good illustration of this. The plaintiff employed an agent to obtain a policy of insurance on a ship. The agent obeyed instructions and caused the defendants to execute the policy. The defendants charged the premium to the agent personally; and he collected the amount of it from the plaintiff. The policy itself, however, remained in the office of the secretary of the defendants. A month later, the defendants demanded payment of the premium by the agent, who failed to pay. Several months later the ship was lost. The court held that the insurance policy was operative and enforceable. The defendants had signed and sealed the instrument and set it aside for manual delivery when called for. Also, they had treated the premium as paid by charging it to the personal account of the agent. The plaintiff had reason to believe that he was insured against loss. The court held that, although no manual delivery to another person had taken place, the defendants had manifested an intention to make the instrument at once operative and that this satisfied the requirement of 'delivery.'

"Cases like the foregoing indicate that the operative fact is overt action by the obligor expressing an intention to make the sealed document at once operative and justifying the obligee in relying upon it." *Id.* at 399-401.

It will be seen at once that there is a factual similarity to the case in the House of Lords there mentioned and the case at hand. Mrs. Twining correctly cites *McGrath v. McGrath,* 213 Md. 442, 445, 132 A. 2d 109 (1957), for the proposition that whether there has been a delivery is a question for the trier of facts. It is obvious that the trier of facts here found from the evidence that there was an acceptance and hence a delivery by National Mort-

gage. There was evidence from which Judge Bowie could have concluded that in June the agent of National Mortgage advised Mrs. Twining's attorney that National Mortgage had accepted the agreement. There also was evidence that he talked to that attorney "several times, primarily in the early part of June," and that the attorney at that time advised the National Mortgage official on behalf of Mrs. Twining that "he had submitted a site plan to the Prince George's County, proper officials, and they asked for thirty changes. They had discussed the changes back and forth for a month. They ended up making . . . four changes on the thirty they requested." Also, that at that time counsel informed the National Mortgage official that "the contract was going to settlement and [National Mortgage] would be paid off," with a comment at a later date relative to "the status of the development . . . [that] the initial settlement should take place within about ninety days, [which] should [result] in National Mortgage receiving at least $300,000, if not more." One of the items that was negotiated between the parties between December and March was a provision ultimately placed in the contract by which National Mortgage upon request would release land from the lien of all trusts held by it "upon payment against the cumulative principal indebtedness owed by Twining to National Mortgage at the rate of Twelve Thousand, Five Hundred Dollars ($12,500.00) per acre to be released." At no point has Mrs. Twining denied that her attorney was her agent for the purpose of representing her in her dealings with National Mortgage and, therefore, one to whom such acceptance could be communicated for her benefit. In short, there was ample evidence upon which the trial judge could conclude as he did.

Of course, the acceptance had to be within a reasonable time, for as Judge Hammond put it for the Court in *Barnes v. Euster*, 240 Md. 603, 214 A. 2d 807 (1965) :

> "It is hornbook law that an offer of no specified duration must be accepted within a time

reasonable under the circumstances or the offer will lapse and a subsequent attempt to accept will be of no effect. Restatement, *Contracts* § 40 (1932) ; 1 Corbin, *Contracts* § 36 (1963) ; 17 C.J.S. *Contracts* § 51 (1963) ; *Van Camp Co. v. Smith,* 101 Md. 565, 573; *cf. Hagan v. Dundore,* 185 Md. 86; and *Chapman v. Thomas,* 211 Md. 102." *Id.* at 607.

Here, it must be borne in mind that the forbearance began in December when negotiations began, that the initial forbearance was until June 30, that negotiations between the parties did not culminate into a·written contract until the middle of March, that it was March 19 when Mrs. Twining's attorney forwarded the revised contract (without Mrs. Twining's initials on the handwritten revision of the revised contract) to National Mortgage, and that Mrs. Twining was given the absolute right in the agreement without additional cost to her other than that there was to then "commence accruing interest at the rate of fifteen percent (15%) per annum on the then unpaid balance" to extend the term of the agreement for an additional six months. Under those facts and circumstances the trial judge did not err in concluding that there was an acceptance within a reasonable time.

*Judgment affirmed; appellant to pay the costs.*