# BARGALE INDUSTRIES, INC. ET AL. *v.* ROBERT REALTY COMPANY, INC.

[No. 197, September Term, 1974.]

*Decided August 28, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Edward L. Blanton, Jr.*, for appellants.

*John J. Kenny* for appellee.

O'DONNELL, J., delivered the opinion of the Court.

This litigation involves the liability of the appellants, BarGale Industries, Inc. (BarGale), and Benjamin L. Goldstein (Goldstein) and his wife Beverly, now deceased, to the appellee, Robert Realty Company, Inc. (Robert Realty) for a "finder's fee" in connection with the obtention of a first mortgage loan in the amount of $193,000 from Suburban Trust Company (Suburban) and in having that commitment increased to $214,000.

Goldstein, president of BarGale who, with his wife, owned 78% of the common stock in BarGale, in connection with a planned relocation and expansion of BarGale's facilities, in August 1972 purchased for $60,000 a tract of land in Owings Mills Industrial Park where it was planned to erect an 18,000 square feet industrial building. Needing additional funds to complete settlement, the Goldsteins, on December 15, 1972, borrowed $35,000 from Mose I. Speert (Speert), president of Robert Realty. That loan was secured by a mortgage upon the land, and a note payable on April 15, 1973. "Points" totalling $2,500 were charged by Speert in connection with the transaction.[1]

Later in December 1972, or early January 1973, Goldstein, having obtained an estimate of $165,000 for the erection of the building — and being obligated to Speert under the note

---

1. The note was repaid in three installments, the first being made on April 15, 1973 and the final payment on June 27, 1973.

— again approached Speert with a request that he assist in obtaining a mortgage of "about $185,000." During these discussions Speert advised Goldstein concerning his estimated eventual costs, counselled him "to seek more money," and told him that if he wished Speert to obtain such a mortgage his fee would be $10,000. Their discussions and understanding were culminated in a letter of authorization dated January 24, 1973, addressed to Robert Realty on the stationery of BarGale Industries, signed by Goldstein, which read as follows:

> "This letter will serve as your authorization to act as our agent for a period of thirty (30) days, for the purpose of arranging a construction loan and permanent first mortgage financing in an amount not less than Two Hundred Thousand ($200,000.00) Dollars and preferably, in the amount of Two Hundred Twenty-Five Thousand ($225,000.00) Dollars, on an industrial building to be erected by us on land we have recently acquired in the Owings Mills Industrial Park. The mortgage will be amortized over a period of fifteen (15) years, with interest at the rate of eight and one-quarter (8 1/4%) to eight and one-half (8 1/2%) per cent per annum. The land and building will be used to secure the mortgage. . . .
>
> "In the event you are successful in securing a commitment for such mortgage, we agree to pay you, at settlement, a fee of Ten Thousand ($10,000.00) Dollars for your efforts."

Supplied with copies of financial statements, preliminary drawings of the proposed building, samples of BarGale's products and its advertising materials, Speert went to work. Although rejected by the Equitable Life Insurance Company, Speert contacted the manager of the Reisterstown Road branch of Suburban who, in turn, arranged a meeting with that bank's real estate officer. These efforts, after several meetings, resulted in a written commitment from Suburban, dated February 15, 1973 (eight days prior to the

termination date set forth in the agreement) of a mortgage in the amount of $193,000, with interest at $8^1/2\%$, amortized over a period of 20 years. Although the commitment was for less than the total amount the appellants hoped to obtain, it was otherwise within the bounds specified. Goldstein accepted it, and the trial court so found.[2]

Thereafter, Goldstein, learning that the original estimated costs of construction had accelerated and that extra construction was required to satisfy the requirements of the Public Works Department of Baltimore County, again sought out Speert explaining that in order to complete the contemplated improvements additional mortgage money was required. Speert volunteered to help to arrange for such additional funds and at a meeting on March 17, 1973, called at BarGale's offices at the request of Goldstein, Speert on behalf of Robert Realty agreed that he would "exert [his] best efforts to influence the Suburban Trust Company to increase their commitment from $193,000 to some larger greater amount." He further agreed that if Goldstein found that he could not obtain such additional money that he (Speert) would "personally loan him $25,000 or $35,000 by way of a second mortgage."

Speert again visited Suburban's real estate officer, advised that the costs of construction had increased, that there was need for additional funds and requested that Suburban review their commitment with the idea of increasing it. This was followed by a letter dated April 30, 1973 from Goldstein, as president of BarGale, to Suburban requesting that it change "our original agreement from $193,000 to $250,625.00 to include these additions." On May 17, 1973 Suburban issued a written "amended commitment" in the amount of $214,000 upon the same terms as set forth in the original. Although Goldstein had requested a much larger sum the amended commitment also was accepted. Settlement was held on June 7, 1973 and the loan proceeds were used to construct the planned building.

---

2. The appellants believe this finding to be an egregious error but specifically note that it "is not the basis for the appeal."

Prior to settlement there had been no indication that the appellants would not pay the agreed fee. Thereafter, however, upon inquiry by Speert, Goldstein advised that the matter had been "turned over" to his attorney. On June 22, 1973, counsel for the appellants wrote Speert disclaiming liability on the ground that the commitment for $193,000, although obtained within 30 days of the agreement, was less than the amount specified.

Robert Realty instituted suit in the Circuit Court for Baltimore County against the appellants individually and jointly.

During the course of that non-jury trial (before Proctor, J.) the appellee, pursuant to Maryland Rule 413 a 2, offered in evidence the deposition of Goldstein as an adverse party, as well as an officer of BarGale. When deposed, Goldstein admitted that he had "accepted" in writing Suburban's original mortgage commitment of $193,000; he acknowledged that he told Speert that he "needed more money" and that when Speert volunteered to "try to get more money," he probably said "Okay," and expected to pay Speert "the original commitment" if he succeeded; that although he recognized that the 30-day period had expired when asked if he "expect[ed]" that he (Speert) was going to do it for nothing, responded "absolutely no," that he "would be paid pursuant to the original contract which [was] $10,000." This acknowledgment by Goldstein that he didn't expect Speert to perform additional services gratis and that he expected to pay him in accordance with the original commitment if he was successful in obtaining additional money was repeated — although with some equivocation — in the deposition.

The trial court in entering judgment in the amount of $10,000 against the appellants jointly,[3] after citing *Griffith v. Scheungrab,* 219 Md. 27, 146 A. 2d 864 (1958) found that:

---

**3.** Appellants expressly do not predicate their appeal upon any disagreement with the entry of judgment jointly against BarGale Industries, Inc. and the Goldsteins. The pleadings alleged and the evidence established that Goldstein was acting not only as the agent of his wife but the agent as well for BarGale.

"[T]he requirement of a minimum mortgage loan of $200,000.00 was *waived* by the acceptance by the Defendants of the commitment in the amount of $193,000.00, at which time there was *in effect a novation* of the understanding between the parties. Not only that, but Mr. Speert performed additional services in getting the original commitment of $193,000.00 increased to $214,000.00, which was not only accepted by Defendants but settled and the proceeds used to construct the desired building, although the ultimate cost unquestionably exceeded the amount of the mortgage loan." (emphasis added).

Seizing upon the lower court's mention of the word "novation," the appellants devote their entire argument to the contention that a novation never occurred. They argue that a unilateral contract existed between the parties and that only a performance by the appellee falling strictly within the original terms of the letter-agreement can suffice to establish an entitlement to the fee. The appellants contend that the trial court was in error "in finding that a 'novation of the understanding between the parties' resulted from the 'waiver' by the [appellants] of a minimum mortgage requirement." At no point in their argument do they undertake to explain why they should not have been held liable for the stipulated fee by having accepted an amount less than that specified.

"[I]t is elementary that either party to a contract may waive any of the provisions made for his benefit." *Twining v. Nat'l Mortgage Corp.*, 268 Md. 549, 555, 302 A. 2d 604, 607 (1973), citing *Shoreham v. Randolph Hills*, 248 Md. 267, 235 A. 2d 735 (1967).

A waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances. "[A]cts relied upon as constituting a waiver of the provisions" of a contract must be inconsistent with an intention to insist upon enforcing such provisions. *Canaras*

*v. Lift Truck Services, Inc.,* 272 Md. 337, 360, 322 A. 2d 866, 877 (1974); *Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 531, 200 A. 2d 166, 172 (1964).

In *Canaras, supra,* we quoted with approval from 5 S. Williston, Law of Contracts § 678 (3rd ed. 1961) as follows:

> "A waiver may be either verbal or in writing; and it is not necessary that the waiver should be direct and positive. It may result from implication and usage, *or from any understanding between the parties which is of a character to satisfy the mind that a waiver is intended.* The assent must, however, be clearly established and will not be inferred from doubtful or equivocal acts or language." 272 Md. at 360-61, 332 A. 2d at 879 (emphasis added).

Whether or not there has been a waiver of such a right under a contract is generally a question of fact. *See Fidelity and Casualty Co. of N. Y. v. Dulany,* 123 Md. 486, 496, 91 A. 574, 577 (1914).

In *Griffith v. Scheungrab, supra,* cited by the lower court, Judge Hammond for the Court stated: "Where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed *or excused.*" 219 Md. at 34, 146 A. 2d at 868 (emphasis added).

By the letter of January 24, 1973, setting forth the understanding between the parties, the appellants imposed two conditions precedent: (1) that the commitment be obtained within 30 days and (2) that it be in the minimal amount of $200,000. When Suburban on February 15, 1973 made a commitment for a mortgage in the amount of $193,000, one of the conditions precedent had been met — the commitment was secured within 30 days. The appellants at that time had a choice of either rejecting the commitment obtained and requiring the appellee to obtain a commitment in the minimal amount of $200,000 within the remaining

eight days of the 30 days allotted, or to accept the commitment as made.

Goldstein admitted that he had, in writing, accepted the commitment. The acceptance was buttressed by his letter to Suburban wherein he acknowledged the "original agreement," but requested an increase to $250,625. His conduct, as the trial court obviously found, constituted by word and act, an unequivocal waiver of one of the conditions precedent — the right to insist that the mortgage commitment be in the minimal amount of $200,000. This acceptance of the commitment for $193,000 was "inconsistent with an intention to insist upon enforcing" such provision. There was thus, evidence of conduct on the part of the parties possessing the right to insist upon a compliance with that condition precedent to show a relinquishment of that right. *See Kimm v. Andrews*, 270 Md. 601, 313 A. 2d 466 (1974). The acceptance of less than the minimal amount specified was a waiver of that condition and a manifestation by the promissor to forego the benefit of that condition and to perform without compliance therewith, and the appellants were bound by the election made. *See Nat'l School Studios, Inc. v. Mealey*, 211 Md. 116, 126 A. 2d 588 (1956).

*See also Glen Alden Corp. v. Duvall*, 240 Md. 405, 424, 215 A. 2d 155, 169 (1965) (holding that the acceptance of performance, not in conformity with the provisions of an agreement as it pertained to the filling-out of labor allowance forms and the sending together of return parts and labor allowances, constituted a waiver of compliance with the "strict terms of the contract"); *John B. Robeson Associates, Inc. v. Gardens of Faith, Inc.*, 226 Md. 215, 222-24, 172 A. 2d 529, 533 (1961) (where the completing of the contract in existence and the acceptance of performance under it after a known breach was held to constitute a waiver of the breach); *Nichols v. Nicholas*, 217 Md. 79, 141 A. 2d 746 (1958) (where the acceptance of payment after the expiration of the date fixed therefor was held to constitute a waiver of the time provision for payment); *Kandalis v. Paul Pet Const. Co.*, 210 Md. 319, 123 A. 2d 345 (1956) (holding

that defects in the construction of a house could be waived where the defects were known or readily discoverable and no complaint about the quality of the work is apparently made).

When appellants were advised that a mortgage commitment for $193,000 had been secured, it seems the oft-quoted adage that "[H]e who is silent when he ought to have spoken, will not be heard to speak when he ought to be silent" became particularly apropos. *See Pumphrey v. Pelton,* 250 Md. 662, 666-67, 245 A. 2d 301, 304 (1968).

We conclude that the factual finding by the trial judge that the requirement of a minimum mortgage loan of $200,000 was waived by the acceptance of the commitment for $193,000 was not clearly erroneous. Maryland Rule 886; *Billmyre v. Sacred Heart Hosp.,* 273 Md. 638, 331 A. 2d 313 (1975); *MacWilliams v. Bright,* 273 Md. 632, 331 A. 2d 303 (1975).

A "novation" is a new contractual relation made with intent to extinguish a contract already in existence. It "contains four essential requisites: (1) A previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution of the new one." *Leisner v. Finnerty,* 252 Md. 558, 250 A. 2d 641 (1969); *Hudson v. Md. State Housing Co.,* 207 Md. 320, 114 A. 2d 421 (1955); *Baltimore Academy of the Visitation v. Schapiro,* 169 Md. 332, 181 A. 731 (1935). *See also* 6 A. Corbin, Contracts § 1297, et seq. (1962).

Unless there was an existing valid contract between the parties and an agreement among them to extinguish it and substitute a new one for it, there could not be a "novation." *Adler v. Walker & Dunlop, Inc.,* 245 Md. 153, 159, 225 A. 2d 459, 462 (1967); *Hudson v. Md. State Housing Co., supra; District Nat'l Bank v. Mordecai,* 133 Md. 419, 105 A. 586, (1919).

The letter written by Goldstein on January 24, 1973 to the appellee was a unilateral contract. Only upon a compliance with both conditions precedent specified therein could a valid existing contract have come into existence between the

parties. Although Speert undertook to obtain such a mortgage commitment from Suburban, his performance, pursuant to the authorization would not have resulted in a binding contract until the conditions precedent had occurred or been performed. *Shoreham v. Randolph Hills, supra,* at 276, 235 A. 2d at 740 (1967); *Barnes v. Euster,* 240 Md. 603, 214 A. 2d 807 (1965); *K & G Construction Co. v. Harris,* 223 Md. 305, 164 A. 2d 451 (1960); *Griffith v. Scheungrab, supra.*

Separate and aside from the issue of waiver of one of the conditions precedent — there was thus no prior valid existing contract between the parties, there could be no creation of a substitution of a new contract and hence, no "novation."

The acceptance of the original loan commitment for $193,000 constituted only a waiver of the minimal mortgage commitment specified in the letter of authorization and did not result in the creation of a new bilateral contract to supersede the pre-existing unilateral one. Additionally, there is no evidence in the record to suggest that the appellee agreed to nullify the obligation on the part of the appellants to pay the fee when Goldstein accepted Suburban's original commitment. *See Adler v. Walker & Dunlop, supra.*

Although we agree with the contention of the appellants that there was not, under the facts of this case, a "novation," as it is defined by law, we think that their reliance upon the conclusion that the trial court erroneously found a "novation" is misplaced.

In *Leisner v. Finnerty, supra,* Judge Finan, in writing for the Court, stated:

> "[W]e find that in Maryland and elsewhere the terms 'novation,' 'merger,' 'accord' and 'substituted contract' have at times been used interchangeably. We think this Court both recognized and answered this problem in semantics when Chief Judge Brune for the Court in *Hudson v. Md. State Housing Co.,* 207 Md. 320, 114 A. 2d 421 (1955), with his usual perspicuity stated:
>
> 'In current legal terminology some

authorities apply the term "merger" or "substituted contract" rather than "novation" to the substitution of a new agreement for an old one between the same parties, and reserve the term "novation" for a new agreement in which one or more new parties are introduced. *Restatement, Contracts, Sections* 424, 443; *Williston, Contracts,* Rev. Ed., Section 1865. The latter points out, however, that *the term "novation" is not uncommonly applied in the common law, as well as in the civil law, to a substituted contract between the same parties.* In this State the term "novation" has been applied to a new contract between the parties as well as to a new contract involving one or more new parties. In *Baltimore Academy of the Visitation v. Schapiro,* 169 Md. 332, 181 A. 731, it is stated that "A novation may occur by a change of parties to the contract, by the change of the subject matter, by the change of the terms and conditions." Likewise, in *District National Bank of Wash. v. Mordecai,* 133 Md. 419, 105 A. 586, this Court said: "A novation may be made by the substitution of a new obligation or contract between the same parties, with the intent to extinguish the old obligation or contract, but it does not result from the substitution of one paper writing for another, . . . or one contract for another, unless such substitution is made with the intention of all parties concerned to extinguish the old one.' " *Id.* at 326-327.

See also, *Williston, Contracts,* 3d Ed., Vol. 2 Section 353; *Corbin, Contracts,* Vol. 6, Section 1293; *Brantly, Contracts,* 2d Ed., Section 175." 252 Md. at 563-64, 250 A. 2d at 643-44. (emphasis added).

When Suburban's commitment for a loan of $193,000 was accepted by Goldstein, the agency of Speert and Robert Realty to act on behalf of the appellants terminated, since it

is "the accepted rule that an authority created to perform a specific act or accomplish a particular result is terminated when the purpose which called it into being is achieved." *Hardy v. Davis*, 223 Md. 229, 233, 164 A. 2d 281, 283 (1960), citing Mechem, Agency (2nd ed.), Secs. 552b, 553. *See also One Twenty Realty Company, Inc. v. Baer*, 260 Md. 400, 408, 272 A. 2d 377, 381-82 (1971). A new oral agency relationship was created when, at the meeting on March 17, 1973, Speert, on behalf of the appellee at the request of the appellants, agreed to "exert [his] best efforts to influence Suburban Trust Company to increase their commitment from $193,000 to some larger greater amount."

Goldstein's deposition offered by the appellee pursuant to Rule 413 a 2 was not limited to purposes of impeachment but was substantive evidence on behalf of the appellee. *See Raleigh Mfrs., Inc. v. Cantela*, 255 Md. 508, 258 A. 2d 403 (1969); *Snowhite v. State ex rel. Tennant*, 243 Md. 291, 221 A. 2d 342 (1966). In that deposition Goldstein acknowledged that even though he recognized that the 30-day period specified in the letter for obtaining the minimal commitment had expired, he did not expect that Speert was then going to "try to get more money" without the expectation of remuneration for such services, and that if Speert did obtain such an additional commitment he "would be paid pursuant to the original contract, which [was] $10,000."

Notwithstanding the waiver of the obtention of the minimal mortgage commitment specified and the entitlement to the appellee of its fee upon that ground, it is clear that as of March 17, 1973, a new agency relationship was created and a new oral agreement was formed with Goldstein promising to pay the $10,000 fee to the appellee if Speert were successful in obtaining an increased loan commitment from Suburban. *See Canaras v. Lift Truck Services, Inc., supra,* at 346-47, 322 A. 2d at 871; *Post v. Gillespie*, 219 Md. 378, 384, 149 A. 2d 391, 395 (1959); *Buffalo Steel Company v. Kirwan*, 138 Md. 60, 64, 113 A. 628, 630 (1921).

As we construe it, when the trial court stated: "at which

time there was in effect a novation of the understanding between the parties," it did not conclude that here had in fact been a "novation" as that term is known in the law but rather, although semantically stated, found that a new oral agreement had been entered into between the parties as a result of which Speert performed additional services in having the $193,000 commitment increased to $214,000 and under that agreement was equally entitled to the payment of the fee agreed upon.

Appellants' factual argument that Speert's efforts — in obtaining an increase of the loan commitment — were confined to contacting a branch manager of Suburban who was not instrumental in increasing the commitment is not borne out by the evidence. The record discloses that Speert met on a number of occasions with the bank's real estate officer who was the one responsible for arranging for an increase in the commitment. Giving due regard to the opportunity of the trial judge to pass upon the credibility of the witnesses and the weight to be given to the testimony, we cannot say that in finding that "Speert performed additional services in getting the original commitment of $193,000 increased to $214,000" the lower court was clearly erroneous. Rule 886; *Billmyre v. Sacred Heart Hosp., supra; MacWilliams v. Bright, supra.*

We conclude that Judge Proctor correctly applied the law to his findings of fact and that judgment was properly entered against the appellants upon the ground of a waiver or upon the ground of a new oral agreement which was performed.

*Judgment affirmed; appellants to pay costs.*